STATE of Tennessee, Appellee,

v.

Byron Lewis BLACK, Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

Aug. 5, 1991.

Charles W. Burson, Atty. Gen. and Reporter, Linda Ann Hammond, Asst. Atty. Gen., Jerry L. Smith, Deputy Atty. Gen., Weakley E. Barnard, Cheryl Blackburn, Asst. Dist. Attys. Gen., for appellee.

Ross E. Alderman, Patrick T. McNally, Jeffrey A. DeVasher, Sr. Asst. Public Defenders, for defendant-appellant.

Capital Case Resource Center of Tennessee, Inc., William P. Redick, Jr., Director, amicus curiae.

Tennessee Dist. Attys. General Conference, George R. Bonds, Executive Secretary, amicus curiae.

## OPINION

DROWOTA, Justice.

The Defendant raises numerous issues in his direct appeal, including whether the

Tennessee Death Penalty Statute violates the Tennessee Constitution. Today a majority of this Court upholds the constitutionality of the Death Penalty Statute in Tennessee under both the State and Federal Constitutions. A majority of the Court also, after a careful review of the entire record, affirms the convictions and the sentence of death. Two members of this Court concur with the holding of the majority that the verdict of guilt be affirmed, but they would reverse the sentence of death and remand for a new sentencing hearing. As part of that remand, the dissenting justices would allow the Defendant the opportunity to present evidence to the Court on the allegation that electrocution as a means of imposing the death penalty is cruel and unusual punishment in violation of Article I, Section 16 of the Tennessee Constitution. The two dissenting justices do not reach the issue of the constitutionality of the Tennessee Death Penalty Statute.

The Defendant, Byron Lewis Black, was convicted of the triple murders of Angela Clay, age 29, and her two daughters, Latoya, age 9, and Lakeisha, age 6. He received life sentences for the murders of Angela Clay (Count One of the indictment) and Latoya Clay (Count Three of the indictment) and was sentenced to death for the murder of Lakeisha Clay (Count Two of the indictment). The jury found six aggravating circumstances.[1]

It appears that these bizarre and tragic murders occurred in the early morning hours of Monday, March 28, 1988. The bodies of the three victims were found Monday evening around 9:30 p.m. At the time of the murders, the Defendant was on weekend furlough from the Metropolitan Workhouse in Davidson County. The Defendant was serving a two-year sentence, after pleading guilty to malicious shooting, a felony.

Since the Defendant challenges the sufficiency of the convicting evidence, we shall summarize the evidence presented at trial. The Defendant was the boyfriend of Angela Clay, who had separated from her husband, Bennie Clay, about a year before her death. Bennie Clay was the father of Latoya and Lakeisha. Bennie Clay testified that at the time of Angela Clay's death, he and Angela were attempting to reconcile, but the Defendant was an obstacle to the reconciliation. He further testified that Angela began a relationship with the Defendant after their separation and that at times she was seeing both the Defendant and himself. In December, 1986, the Defendant and Bennie Clay had an altercation during a dispute over Angela. As Bennie Clay was returning to his car, the Defendant shot at him. One shot hit the car, another hit Clay in the right foot, and another shot hit him in the back of his left arm. The bullet that went through his left arm lodged under his collar bone. Clay testified that he started running up the street and the Defendant chased him, continuing to shoot. Clay was finally unable

---

1. T.C.A. § 39–2–203(i). No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

(1) The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older;

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb;

(12) The defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan.

The Defendant contests three of the six aggravating circumstances: (5), (6) and (12).

to run any farther. He fell down, and the Defendant stood over him and had cocked the gun when Angela Clay ran up to the Defendant and pushed him away. Angela then took Bennie Clay to the hospital, where he remained for seven days. The Defendant pled guilty to the shooting and received the workhouse sentence, which included weekend furloughs.

On Friday afternoon around 5:30 p.m., March 25, 1988, the Defendant was released from the workhouse on a weekend furlough. He returned to the workhouse on the evening of Monday, March 28, at approximately 5:15 p.m. after the murders were committed, but before the bodies were discovered.

Angela and her two daughters were last seen Sunday evening around 11 p.m. Angela's sister, Lenette Bell, had borrowed Angela's car on Sunday. Angela was employed at Vanderbilt Hospital, where she worked from 1:30 p.m. to 10 p.m. daily. Lenette Bell arranged to pick up Angela at the hospital at 10 p.m. When Lenette Bell arrived at the hospital, the Defendant was also waiting there for Angela. Angela's children, who were with Lenette Bell while their mother was working, chose to ride with the Defendant and their mother from the hospital. The Defendant drove Angela and her two daughters to the home of Amelia Bell, the mother and grandmother of the victims. Ms. Bell testified that the Defendant left her house in his car, and that her daughter and granddaughters left her house in her daughter's car about 10:20 p.m. Angela returned about 11 p.m. to pick up an iron she had forgotten. That was the last time Ms. Bell saw her daughter alive. Lenette Bell testified that Angela telephoned her at approximately 11:20 p.m. that evening. That was the last time any of the witnesses spoke to the deceased before her untimely death.

When Ms. Bell's daughter failed to return the iron the next morning, she telephoned her daughter but got no answer. She continued to call Angela throughout the day but received no answer. She became concerned and asked another daughter to drive to Angela's apartment. No one answered her knocks at the door. Ms. Bell made other telephone calls to try to locate her daughter and then went to her daughter's apartment with Lenette Bell, but no one responded to their knocks on the door. All the shades were drawn and Angela's car was parked outside of her apartment. It was then they decided to call the police.

The police arrived at approximately 9:30 p.m. on Monday evening, March 28, 1988, and found no signs of forced entry into the apartment; the door was locked. Officer James was able to open a window after prying off a bedroom window screen. All the lights were off. He shined a flashlight into a child's room and saw a pool of blood on the bed and the body of a small child on the floor. He exited the room, and officers secured the scene.

Investigation revealed the bodies of Angela and her nine year old daughter, Latoya, in the master bedroom. Angela, who was lying in the bed, had apparently been shot once in the top of the head as she slept and was rendered unconscious immediately and died within minutes. Dr. Charles Harlan, Chief Medical Examiner for Davidson County, testified that she was probably shot from a distance of six to twelve inches and that her gunshot wound was the type usually caused by a large caliber bullet.

Latoya's body was found partially on the bed and partially off the bed, wedged between the bed and a chest of drawers. She had been shot once through the neck and chest. Blood on her pillow and a bullet hole in the bedding indicated she had been lying on the bed when shot. Dr. Harlan testified that she was shot from a distance of greater than twenty-four inches from the skin surface. The bullet path and type of shot indicated that death was not instantaneous but likely occurred within three to ten minutes after her being shot. Bullet fragments were recovered from her left lung. Both victims were under the bedcovers when they were shot.

The body of Lakeisha, age six, was found in the second bedroom lying facedown on the floor next to her bed. She had been shot twice, once in the chest, once in the

pelvic area. Dr. Harlan testified that she had died from bleeding as a result of a gunshot wound to the chest. She was shot from a distance of six to twelve inches and died within five to thirty minutes after being shot. Abrasions on her arm indicated a bullet had grazed her as she sought to protect herself from the attacker. Bullet holes and blood stains on the bed indicated that she was lying in bed when shot and had moved from the bed to the floor after being shot. There were bloody finger marks down the rail running from the head of the bed to the foot of the bed. The size of the wounds and the absence of bullet casings indicated that a large caliber revolver had been used to kill the victims.

One projectile was collected from the pillow where Latoya was apparently lying at the time she was shot. Fragments of projectiles were collected from the wall above Angela's head; others were collected from the mattress where Lakeisha was found.

The receiver from the kitchen telephone was found in the master bedroom. The telephone from the master bedroom was lying in the hallway between the two bedrooms. The Defendant's fingerprints were the only prints recovered from the telephones. Two of his fingerprints were found on the phone in the hallway, and one was on the kitchen telephone receiver found in the master bedroom.

Angela Clay's upstairs neighbors, Patricia Meacham and her nineteen-year-old daughter, Donzaloe Gardner, reported that between 1:00 and 1:30 a.m. on March 28 they had been awakened by four loud noises, two in quick succession followed by a pause of 30 seconds, then two more noises which "sounded like somebody had a hammer hitting on a countertop real hard." The noises were so loud they both arose from bed and looked out the window but saw nothing. The noises seemed to come from the apartment below.

The evidence connecting the Defendant to the killings was circumstantial. There was evidence that the relationship between Angela and the Defendant had not been tranquil. For example, in October 1987, the Defendant had kicked in the front door

of Angela's apartment when she did not let him in. Sometime later he told Angela, "If I can't have you, won't nobody have you." Three weeks before the murders, Angela's neighbor, Patricia Meacham, had heard the Defendant knocking on the door and the window of Angela's apartment and threatening to kick the door in. The Friday before the killings, Angela and the Defendant were seen arguing.

Around midnight the night the bodies were discovered, police went to the Metropolitan Workhouse to interview the Defendant. When informed by a detective that his girlfriend had been found murdered in her apartment, the Defendant looked shocked, distraught, was visibly upset, and began crying. When two other detectives entered the room, Defendant's whole demeanor changed, the tears ceased, and he became "dull." He stated that the last time he had seen Angela was Sunday, March 27, at about 10 p.m., when he dropped her off at her mother's house after picking her up at work. He then went to Charlotte Waldon's residence, where he had a late supper with her and other friends. He stated he left Ms. Waldon's house about 11:30 p.m., drove to his mother's apartment where he slept until 6:30 a.m. Monday. Defendant was cooperative and willingly turned over to the police what he claimed was his "only gun," a nine shot .22 caliber Ruger he said he had used to shoot Bennie Clay.

Charlotte Waldon and several other witnesses testified that the Defendant came to Ms. Waldon's at approximately 8:30 p.m., ate dinner, and left at approximately 9:30 p.m. He did not come back again that evening.

After further investigation, two formal taped statements were taken from the Defendant. The first interview was conducted at approximately 6:30 Tuesday morning, March 29. In the first statement the Defendant claimed that, after leaving Angela and the girls at Angela's mother's house, he had gone straight to his mother's house, where he remained the rest of the night.

The second interview was conducted at approximately ten o'clock the same morn-

ing with Defendant's attorney present. In his second statement, the Defendant said that he dropped off Angela and her two children at her mother's house. He then stated that he went to Angela's apartment later Sunday night, he did not recall the exact time, and she wasn't there. He sat out in front of the apartment in his car for a short period of time and then left. He returned a second time, saw Angela's car and, finding the door open, went inside the apartment. The Defendant stated, "I went inside and I saw all of them in there and I panicked." He described seeing Angela, Latoya and Lakeisha lying dead in their beds with the covers over them. He said he "may have" touched the telephone while he was in the apartment. He noticed that the telephones had been thrown on the floor and remembered that he was afraid to touch them because he might get his fingerprints on them. He said he had not sought assistance for the victims because "I didn't want to get involved." Locking the door, he then left the apartment and drove back to his mother's house. There, although he had just discovered his girlfriend and her children dead, in his own words, "I got me at least seven or eight hours of sleep on my mother's couch." The Defendant did not report the deaths or tell anyone what he had seen that night until the interview Tuesday morning.

During the interview he suggested that Bennie Clay was the murderer. Later, when police officers informed the Defendant that they could determine the caliber of the weapon used to shoot Bennie Clay, the Defendant said that he had shot Clay with a .357 Magnum, not a .22 caliber, and had thrown the weapon into the Cumberland River. He had previously told an acquaintance he had sold the gun used to shoot Bennie Clay. The same acquaintance also testified that he had seen the Defendant with a large caliber pistol in his possession four or five years before.

Bennie Clay agreed to have the bullet surgically removed from his shoulder. Clay testified that the gun used by the Defendant to shoot him had looked like a "big caliber pistol" or revolver. The slug removed from Clay was a .44 caliber bullet.

Significantly, a firearms expert from the TBI testified that the .44 caliber bullet recovered from Latoya's pillow, the .44 caliber bullet removed from Lakeisha's body, a bullet fragment from the automobile driven by Bennie Clay the day the Defendant shot him, and the .44 caliber bullet removed from Bennie Clay's body had all been fired from the same weapon.

The Defendant's defense was that of alibi. His mother and nephew testified to the effect that the night the victims were murdered, the Defendant had come to his mother's home around 11 p.m. and had remained there all night.

At the sentencing hearing the Defendant presented the testimony of a former teacher, friends, his mother, former wife, aunt and siblings that he had been a good student, a good father, a good provider, a responsible, polite, friendly, helpful, and nonviolent person whom they would support if he was given a life sentence. His brother-in-law, a minister, testified about the Defendant's religious conversion. The psychological co-ordinator at the Metro Sheriff's Department testified that Defendant was a "model inmate."

## I.

The Defendant first contends that the trial court erred in ruling that he was competent to stand trial. Ten days before trial, upon motion of defense counsel, the trial court conducted a hearing for purposes of assessing the Defendant's competency to stand trial. During the hearing, the trial court stated that he had considered the standard of competence set out in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), *Mackey v. State,* 537 S.W.2d 704 (Tenn.Crim.App. 1975), as well as the most recent case of *State v. Benton,* 759 S.W.2d 427 (Tenn. Crim.App.1988). In *Dusky v. United States, supra,* the United States Supreme Court described the standard under which a trial court determines whether a Defendant is competent to stand trial:

"... the test must be whether [the defendant] has sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." 80 S.Ct. at 788–89.

The *Dusky* standard was adopted in *Mackey v. State, supra,* which held:

"Both Tennessee decisions and the federal constitution prohibit the trial of a defendant whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." 537 S.W.2d at 707.

The purpose of a competency hearing does not concern the Defendant's guilt or innocence, or even his mental condition at the time of the crime. In *State v. Stacy,* 556 S.W.2d 552 (Tenn.Crim.App.1977), the Court described the inquiry as follows:

"[A] competency hearing is a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial. In this State, a defendant is considered competent to stand trial if he has mind and discretion which would enable him to appreciate the charges against him, the proceedings thereon, and enable him to make a proper defense." 556 S.W.2d at 553.

The trial judge, in discussing the burden of proof, stated: "If the Defendant raises a viable question about competency, then the burden is on the state to prove competency [by a preponderance of the evidence that the Defendant is competent to stand trial]." The Defendant submits that the evidence adduced at the competency hearing established that he lacked the capacity to understand the nature and object of the proceedings against him and that he had insufficient ability to consult with counsel and to assist in preparing his defense.

At the competency hearing the Defendant presented the testimony of Dr. Kenneth Anchor, a licensed psychologist who had tested and interviewed Defendant, and of Ross Alderman, one of the Defendant's attorneys. The substance of their testimony was that the Defendant did not comprehend the judicial process (*e.g.,* he was unable to distinguish between the roles of the judge and jury), did not understand his counsel's role, and was unable to fathom the possible consequences of the trial. In their opinion, the Defendant was unable to assist his attorney in the preparation of his defense. The State presented the testimony of a clinical psychologist, a psychiatrist, and a social worker from the Dede Wallace Mental Health Center, all of whom had also interviewed the Defendant. They concluded that the Defendant was competent to stand trial. The consensus of the mental health professionals was that the Defendant's I.Q. was in the lower end of the normal range (76, according to Dr. Anchor) and that the Defendant was not psychotic or delusional, although he probably suffered a personality disorder of some sort.

At the conclusion of the hearing, the trial judge stated, "Given the seriousness of this matter, I feel that I'm going to appoint a psychiatrist to do an independent evaluation and report back to the court." He appointed Dr. William Kenner to do the evaluation and reset the matter for further hearing. Dr. Kenner, after interviewing the Defendant, testified that the Defendant was "clearly competent." The court thereupon stated, "I think that the Defendant presently has the ability to consult with his lawyer with a reasonable degree of rational understanding, and he has a rational as well as factional understanding of the proceedings against him. In my opinion, he is competent to stand trial." Later, after the trial had begun and defense counsel had again raised the issue, Dr. Kenner testified at the conclusion of voir dire that after interviewing Defendant a second time, he found the Defendant "still competent." Dr. Kenner stated that the Defendant not only met but went beyond the minimum threshold for competency. Relying on Dr. Kenner's evaluation and its own observations of Defendant during voir dire, the trial judge reaffirmed his ruling that Defendant was competent to stand trial.

Under the standards enunciated in *Dusky, Mackey* and *Benton,* we are of the opinion that the Defendant understood the

nature and object of the proceedings against him and was able to consult with and assist counsel in preparing his defense. The evidence does not preponderate against the trial court's finding of competence.

## II.

The Defendant next challenges the sufficiency of the convicting evidence. He contends that the trial court erred in overruling his motion for a judgment of acquittal as to all counts of the indictment. He avers that the evidence presented at trial was insufficient to convince any rational trier of fact that he was guilty of the offenses charged beyond a reasonable doubt. Rule 13(e), T.R.A.P.

The Defendant submits that there were no eyewitnesses to the offenses for which he was convicted and that the proof against him consists entirely of circumstantial evidence. He further contends that it is reasonable to believe that, at the time of the murders, some person other than himself had possession of the gun with which he shot Bennie Clay in 1986. The State responds that the body of evidence, although circumstantial in nature, unerringly pointed the finger of guilt to the Defendant and effectively excluded every other theory or hypothesis except that of Defendant's guilt.

■ The principles which govern our review of a conviction by jury are well settled. A jury verdict approved by the trial judge credits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983); *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown,* 551 S.W.2d 329, 331 (Tenn.1977).

Where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), T.R.A.P. Moreover, a conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); *State v. Williams,* 657 S.W.2d 405 (Tenn.1983); *State v. Crawford,* 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971).

■ The Defendant was with the victims the evening they were murdered. He had been fighting with Angela Clay just a few days before the killings. The Defendant had previously threatened to kill Angela. The evidence established that the Defendant's fingerprints were on two telephones that were thrown on the floor of the victims' apartment. No other fingerprints were found on the telephones. The .44 caliber bullet recovered from Latoya's pillow, the .44 caliber bullet taken from Lakeisha's body, a bullet fragment from the automobile driven by Bennie Clay the day the Defendant shot him, and the .44 caliber bullet removed from Bennie Clay's body had all been fired from the same weapon the Defendant used to shoot Bennie Clay. The Defendant gave inconsistent statements regarding the location of the weapon, telling one person he had sold the gun and telling the police that he had thrown the gun into the Cumberland River. Defendant also gave inconsistent statements regarding his whereabouts the evening of the murders. He first told authorities of an alibi and did not mention entering the victims' apartment. In a second statement, he admitted entering the apartment and seeing the bodies of the victims. He described the victims, asleep and under the bedcovers, just as the murderer would have seen them when he killed them, and not as

one who had come upon the scene after they were dead would have seen them—one victim on the floor, and one partially off her bed. The defendant's statements were damaging. He stated that after finding the bodies of his girlfriend and her children, he left the apartment, locked the door, and, without reporting the shootings, returned to his mother's home, where he tried to get some sleep. His excuse for this unusual behavior—he didn't want to get involved.

Based upon the foregoing circumstantial evidence, we have no hesitancy in holding that the evidence against the Defendant Black was sufficient to support the three first degree murder convictions beyond a reasonable doubt. The evidence does not preponderate in favor of his innocence and against his guilt.

### III.

■ The Defendant next raises an evidentiary issue. He alleges that the trial court erred in allowing a prosecution witness to testify regarding a telephone conversation between the witness, the Defendant, and Angela Clay. After a jury-out hearing on the admissibility of the telephone conversation, the trial judge admitted evidence concerning a telephone call to Angela Clay made by the Defendant approximately two weeks before the murders. Angela's sister, Lenette Bell, testified that she had answered the telephone and recognized the Defendant's voice. When the Defendant asked to speak to Angela, Lenette gave her sister the telephone. At some point during the phone call, Lenette heard Angela say, "You're going to do a Sterling Gray on who?"[2] Lenette asked her sister what she had said and Angela told her, "He said he was going to do a Sterling Gray on me." Angela was holding the telephone so that the Defendant could have heard what she was saying to her sister. Lenette took the receiver from Angela and told the Defendant that if he intended to "do a Sterling Gray, he might

as well do it the same way Sterling Gray did, and that is kill his damn self." The Defendant replied, "Huh?" The trial court admitted this evidence as a tacit admission by the Defendant. *See generally*, Paine, *Tennessee Law of Evidence*, § 57 (1974); *Cf.* Cohen, Paine and Sheppeard, *Tennessee Law of Evidence*, § 803(1.2).3, p. 401 (2d Ed.1990) (for status of rule under new Tennessee Rules of Evidence).

The trial court gave a cautionary instruction to the jury on this evidence at the close of the guilt phase as follows:

"Members of the jury, you have heard testimony that the Defendant remained silent when a statement was made in his presence at a time when he was not under arrest or in custody. Such evidence should be received with caution. Statements directed against the accused and in his presence may, in the absence of any denial or explanation, be entitled to weight as evidence. On the other hand, his silence might be more or less equivocal, and of little probative value. If the jury finds that Defendant actually heard and understood the accusatory statements, and that they were made under circumstances that the Defendant might be expected to have denied them if they were not true, then the jury should consider whether the Defendant's silence was an admission of the truth of the statements, and give the silence whatever weight the jury believes it is entitled."

Both parties rely on the case of *Ledune v. State*, 589 S.W.2d 936, 939 (Tenn.Crim. App.1979), in which the Court states:

"Tennessee has long recognized the rule that when a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny it or make any response to it, is admissible against him as evi-

**2.** Sterling Gray was a Criminal Court Judge in Nashville who died, along with his estranged wife, in an apparent murder-suicide in January 1988. No proof was presented at trial concern-

ing the meaning of this reference. The State apparently was depending on the general notoriety of Judge Gray's death to convey to the jury the threatening nature of Defendant's statement.

dence of his acquiescence in its truth. [Citations omitted.]

In recent times in criminal cases this rule of tacit admissions has been modified by constitutional developments, and it will not be applied where the statement and failure to deny occurred after police custody and interrogation. [Citations omitted.] However, the rule is still viable if the accusation and silence takes place prior to police custody." 589 S.W.2d at 939.

The Defendant's basic argument is that no accusation was made that would have demanded a denial from him because Angela's sister was not accusing him of telling her sister he was going to kill her but informing him that he should commit suicide. Much of the resolution of this issue depends on the intonation of the accusation and of the Defendant's reply.

The record establishes that the statement of Lenette Bell identified the Defendant as the target of an accusation, that the Defendant knew well the reference that was being made, that the accusation was of an incriminating character, and that the accusation was not denied or objected to by the Defendant. We are of the opinion that the testimony relating Defendant's adoptive admission was properly admitted by the trial court.

### IV.

■ The Defendant alleges that the trial court erred in not allowing defense counsel to cross-examine a prosecution witness concerning a pending felony indictment against him. Defendant unsuccessfully sought to impeach prosecution witness Bennie Clay by examining him about an indictment pending in Davidson County Criminal Court charging him with possession of cocaine for resale and possession of a firearm during the commission of a felony. Clay had been arrested on these charges in August 1988, several months after his wife and daughters were killed and the bullet had been removed from his shoulder.

The Defendant asserts that the evidence of the pending indictment was admissible to impeach the witness by showing bias. Relying on the case of *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the trial court held that "under the unique fact situation in this case" where the witness's prior statements to police were consistent with his testimony and were made long prior to his arrest, there was no argument that the pending charge could have affected his testimony and the evidence of the indictment was only "marginally relevant" and would have confused the case.

Defendant argues that failure to allow introduction of the pending charges violated his right to confrontation under the Sixth Amendment of the U.S. Constitution and Article I, Section 9, of the Tennessee Constitution. "[A] criminal defendant states a violation of the [federal] Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436; *see also Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). The defendant must show that a reasonable jury might have received a significantly different impression of the witness's credibility had counsel been permitted to pursue his proposed line of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436. Such an improper denial of the right to confrontation is subject to harmless error analysis. *Id.*, 475 U.S. at 681, 106 S.Ct. at 1438.

Because of the "marginal relevance," of this issue and the obvious bias of the witness against the Defendant, if the trial court erred in restricting cross-examination on this point, any error was harmless beyond a reasonable doubt. *See State v. Taylor*, 668 S.W.2d 681, 683–684 (Tenn. Crim.App.1984).

### V.

■ The Defendant next avers that the trial court erred in allowing testimony con-

cerning alleged threats made by the Defendant against third parties on the evening before the victims' bodies were discovered. The Defendant, when interviewed at the Metropolitan Workhouse, had stated that he went to Charlotte Waldon's residence on Sunday evening after he had dropped Angela and her two daughters off at her mother's house. He initially stated that he had a late supper with Charlotte and her other friends at her home, left around 11:30 p.m., drove to his mother's apartment, where he stayed the rest of the night. Charlotte Waldon and several of her friends testified that Defendant was in Charlotte's home between 8:30 and 9:30 the evening of March 27th. Cheryl Moten, one of the friends, also testified that, when the Defendant left, he said, "When I leave and come back through here, if I see any light on, I will ... shoot through the door." Gary Gooch, another friend, testified that he heard Defendant say that "if he didn't get in, he was going to shoot the door down." The Defendant objected to the testimony of Moten and Gooch. The trial judge found the evidence relevant and admitted it as "an implicit admission that [Defendant was] in possession of a firearm." The Defendant insists that even if the testimony were relevant, the subject evidence was more prejudicial than probative, since there was other testimony relating to the Defendant's possession of a weapon. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn.1978).

We are of the opinion that Defendant's possession of a weapon the evening of the murders was entirely relevant to this action and the trial court properly considered the evidence more probative than prejudicial and properly allowed its presentation to the jury. Under the proof in this case, if there were any error in this regard, it was harmless. *Cf. State v. McKay*, 680 S.W.2d 447, 452 (Tenn.1984) (prior robbery admissible to prove possession of murder weapon).

## VI.

█ The Defendant next complains that the trial court erred in denying his motion

to exclude the death penalty because electrocution is cruel and unusual punishment. Citing accounts of the suffering experienced in death by electrocution, he argues that even if death itself is not unconstitutional, electrocution as a means of death violates the Eighth Amendment. T.C.A. § 40–23–114 requires that any person sentenced to death shall be put to death by electrocution.[3] In *State v. Adkins*, 725 S.W.2d 660, 664 (Tenn.1987), the Defendant also alleged that the use of electrocution, when there are more humane forms of legal killing, such as lethal injection, violates the constitutional prohibition against cruel and unusual punishment. Justice Fones, speaking for the Court, stated: "The validity and humanity of that complaint should be addressed to the Legislature. This Court's authority over punishment for crime ends with the adjudication of constitutionality." *See State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988); *State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn.1984). [For a list of Tennessee and federal cases rejecting this argument, *see Teague v. State*, 772 S.W.2d 915, 924, n. 13 (Tenn. Crim.App.1988).]

Although not raised as an issue on appeal, Chief Justice Reid, in his dissenting opinion, states that he "would remand the case to the trial court to afford the defendant the opportunity to present evidence on the allegation that electrocution as a means of imposing the death penalty is cruel and unusual punishment in violation of Article I, Section 16 of the Tennessee Constitution." He states "that electrocution as a method of imposing the death penalty may be cruel and unusual punishment" and would, therefore, like the trial court to reexamine this issue. He further states that "the literature ... suggests that electrocution involves suffering beyond that necessary 'in any method employed to extinguish life humanely.'" The dissenting opinion asks the trial court to review evidence of the actual pain inflicted by electrocution in

**3.** The method of execution was changed from hanging to electrocution by the Public Acts of 1913, Chapter 36.

order to determine whether this method of extinguishing a prisoner's life involves "unnecessary cruelty."

A majority of this Court is of the opinion that electrocution is a constitutionally permissible method of execution. The argument raised in the dissenting opinion has been uniformly and summarily rejected by both State and Federal Courts. *See, e.g., Sullivan v. Dugger,* 721 F.2d 719, 720 (11th Cir.1983) (order); *Spinkellink v. Wainwright,* 578 F.2d 582, 616 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979); *Dix v. Newsome,* 584 F.Supp. 1052, 1068 (N.D.Ga. 1984); *Mitchell v. Hopper,* 538 F.Supp. 77, 94 (S.D.Ga.1982); *Stripling v. State,* 261 Ga. 1, 401 S.E.2d 500, 506 (1991); *Buenoano v. State,* 565 So.2d 309, 311 (Fla.1990); *Wallace v. State,* 553 N.E.2d 456, 474 (Ind. 1990); *State v. Coleman,* 45 Ohio St.3d 298, 544 N.E.2d 622, 633 (1989); *Pruett v. State,* 282 Ark. 304, 669 S.W.2d 186, 189 (1984); *Stockton v. Com.,* 227 Va. 124, 314 S.E.2d 371, 378 (1984); *Booker v. State,* 397 So.2d 910, 918 (Fla.1981), *cert. denied,* 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981); *State v. Shaw,* 273 S.C. 194, 206, 255 S.E.2d 799, 804–805, *cert. denied,* 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979). *See also, State of Louisiana v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (carrying out execution of convicted murderer, after first execution failed due to mechanical defect in electric chair, did not constitute cruel and unusual punishment).

The issue presented to this Court, and which will be discussed in Section VII, deals with the admission of evidence of procedures and circumstances surrounding electrocution to be presented to the sentencing jury.

## VII.

The Defendant next contends that the trial court's exclusion of testimony, before a jury, about the procedures surrounding an execution, electrocution itself and the electric chair, denied him his due process right to a fair sentencing hearing. The Defendant filed a pretrial motion seeking admission of evidence "concerning the nature and effect of electrocution." The trial court overruled the motion following a pretrial hearing. The Defendant submits that the trial court's error in not allowing him to introduce evidence on the nature of electrocutions, was prejudicial because the jury was deprived of relevant evidence of procedures and circumstances surrounding electrocution during the sentencing hearing.

 This Court has repeatedly refused to allow this type of evidence at sentencing in a death penalty case because it is irrelevant to the factors to be considered by the jury. This information is more properly presented to the Legislature. *See State v. Wilcoxson,* 772 S.W.2d 33, 39–40 (Tenn.1989); *State v. Adkins,* 725 S.W.2d at 665; *State v. Johnson,* 632 S.W.2d 542, 548 (Tenn.1982). The only evidence which is relevant during the sentencing phase in a capital case is that evidence which is relevant to establish or disprove the existence of aggravating circumstances or mitigating factors. *Cozzolino v. State,* 584 S.W.2d 765 (Tenn.1979).

## VIII.

 The Defendant alleges that the trial court erred in denying him funds to employ a juristic psychologist in order to insure that the full and candid responses from prospective jurors would be completely evaluated.

Prior to the trial, defendant counsel filed a motion for funds to employ a juristic psychologist. Noting that Defendant's request did not comply with Section 1(B)(10) of Supreme Court Rule 13, the trial court denied the request. The court held that, even if the rule had been complied with, it would find no due process need to appoint a juristic psychologist.

The Defendant contends that without the assistance of a juristic psychologist, he was denied a full evaluation of the propensities of prospective jurors for fairness and bias and was denied his right to an impartial jury and due process rights to a fair trial. T.C.A. § 40–14–207(b) allows the trial court in a capital case the discretion to grant funds for expert services necessary to in-

sure that the constitutional rights of an indigent defendant are properly protected. There has been no showing of any special need for a jury selection expert or that the trial judge in this case has abused its discretion.

Although there is no case directly on point in this jurisdiction, other states that have addressed the issue of a trial court's propriety in denying a motion for funds for a jury selection expert have found that there is no error in the trial court's denial where the defendant has failed to particularize his need for such an expert, even in death penalty cases. In *State v. Williams*, 304 N.C. 394, 284 S.E.2d 437, 446 (N.C.1981), the court found no error in refusing a jury selection expert when the record showed no reasonable likelihood that appointment of an expert would have materially assisted the defendant in his defense or that the absence of assistance deprived the defendant of a fair trial. *See also State v. Yates*, 280 S.C. 29, 310 S.E.2d 805, 809 (1982); Annot. 34 A.L.R.3d 1256, § 17 (1990 Supp.).

### IX.

■■■■ The Defendant next asserts that the trial court's refusal to sequester tentatively selected jurors before trial was error. Prior to trial, defense counsel moved that tentatively selected jury members be sequestered. The trial court overruled the motion. After admonishing prospective jurors not to talk about the case with anyone or to read the newspaper or to watch or listen to the local news on television and radio, the court allowed prospective jurors to separate during voir dire at the end of each day. After similar admonitions, the court continued to allow the jury and alternates who had been tentatively selected to separate over the weekend prior to their being sworn and the beginning of the trial. After the jurors were sworn, they were sequestered for the remainder of the trial.

Defendant asserts that the failure to sequester tentatively selected jurors denied him his rights to a fair trial by an impartial jury. Defendant makes no showing that

any prejudice occurred to him from the failure to sequester the tentatively selected jurors but advocates a *per se* rule of sequestration of tentatively selected jurors in capital cases.

In *State v. McKay*, 680 S.W.2d 447, 452–453 (Tenn.1984), this Court held that a trial judge has the discretion to allow the separation of tentatively selected jurors with appropriate admonitions until they are sworn and required to be sequestered in both capital and noncapital felony cases. There is no showing that the trial court in this case abused its discretion, that there was any jury misconduct, or that the failure to sequester the jurors before they were sworn prejudiced the Defendant in any way. We find no merit to this issue. *See also State v. Poe*, 755 S.W.2d 41, 46 (Tenn.1988).

### X.

■■■■ The Defendant argues that the trial court erred in excusing certain prospective jurors because of their feelings about the death penalty without allowing questioning by Defendant's counsel. Voir dire was conducted as follows: First, individual voir dire was conducted as to two issues— (1) the effect of the prospective juror's views regarding the death penalty on the juror's ability to follow the law of capital sentencing and (2) the prospective juror's exposure to outside information about the case. The court conducted a general preliminary examination on these matters; and, if the juror's answers did not give clear grounds for excusal for cause, the State, followed by the defense, then fully explored these issues with each juror. When thirty-six prospective jurors had completed individual voir dire, the parties conducted group voir dire on other matters and exercised their peremptory challenges.

The Defendant challenges the trial court's actions regarding six prospective jurors. He says that the trial court's refusal to allow him to conduct voir dire of these six jurors, after the trial court had concluded from its preliminary examination that the juror's views on the death penalty would prevent their following the law, vio-

lated Defendant's rights under the state and federal constitutions. Defendant's broader argument appears to be that in capital cases judges should not voir dire prospective jurors regarding their views on the death penalty because the court's examination might inhibit the free and truthful expression of the juror's opinions.

We find the trial court committed no error in the present case. The responses of the prospective jurors revealed that their views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths. This met the standard of *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Under the standard set by this Court in *State v. Alley,* 776 S.W.2d 506, 517–518 (Tenn.1989), according the trial court's finding of bias a presumption of correctness, no reversible error occurred in this case in the court's refusal to allow the defendant to rehabilitate these jurors. *See State v. Strouth,* 620 S.W.2d 467, 471 (Tenn.1981).

### XI.

The Defendant contends that the trial court erred in overruling his motion to dismiss the statutory aggravating circumstance enumerated in T.C.A. § 39–2–203(i)(5) because the statute is unconstitutionally vague. The jury found that the murder of Lakeisha Clay, Count Two, fell under the aggravating circumstance stated in T.C.A. § 39–2–203(i)(5) (1982) in that "the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." [4] At trial and on appeal, Defendant argues that this circumstance is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9, of the Tennessee Constitution.

This Court has previously upheld the validity of this aggravating circumstance in

the face of similar attacks particularly where, as here, the jury has been properly instructed on the meaning of the terms used in the statute in accordance with *State v. Williams,* 690 S.W.2d 517, 526–530 (Tenn.1985). *See, e.g., State v. Henley,* 774 S.W.2d 908, 918 (Tenn.1989); *State v. Taylor,* 771 S.W.2d 387, 399 (Tenn.1989); *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn. 1989); *Cf. State v. Hines,* 758 S.W.2d 515, 521–524 (Tenn.1988).

In the instant case, the trial court's definitions of the terms "heinous," "atrocious," "cruel," "depravity," and "torture" removed any vagueness and narrowed the class of persons eligible for the death penalty to those who have committed more aggravated murder. Torture was defined in *Williams, supra,* and the jury so instructed, as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved." 690 S.W.2d at 529. As described earlier in this opinion, after killing Lakeisha's mother and sister Latoya in the adjoining bedroom, the Defendant then entered the bedroom of a frightened and defenseless six-year-old child and proceeded to kill her. Bullet holes and blood stains revealed that Lakeisha was shot once in her bed, for Officer James, when he entered her bedroom, observed a pool of blood on the bed and fragments of projectiles were recovered from the mattress. Abrasions on Lakeisha's arm indicated a bullet had grazed her as she sought to protect herself from the Defendant. There were bloody finger marks on the rail running from the head of the bed to the foot of the bed. She was found lying face down on the floor of her room, having been shot twice, once in the chest and once in the pelvic area. She was shot from a distance of six to twelve inches

---

4. In the new criminal code this circumstance has been changed to read: "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." T.C.A. § 39–13–204 (1990 Supp.).

and died between five to thirty minutes after being shot. Three members of this Court have concluded that the jury could have found this brutal and senseless execution style murder of a helpless child, who could not protect herself, evinces torture or depravity of mind as defined in *Williams*.

The most recent pronouncement of the United States Supreme Court regarding an aggravating circumstance substantially similar to that in (i)(5) is *Walton v. Arizona*, 497 U.S. ——, 110 S.Ct. 3047, 3056–3058, 111 L.Ed.2d 511 (1990), upholding as constitutional Arizona's "specially heinous, cruel or depraved" aggravating circumstance under the limiting definitions given to those terms by the Arizona Supreme Court. The limiting definitions adopted by the Arizona court are similar to those adopted by this Court in *Williams, supra*. This issue is without merit and cannot provide a basis for relief.

## XII.

■ The Defendant also contends that the trial court erred in denying his motion for a judgment of acquittal as to the statutory aggravating circumstance contained in T.C.A. § 39–2–203(i)(6), relative to a murder "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." The jury found the existence of this statutory aggravating circumstance and returned a verdict of death as to Count Two of the indictment, regarding the death of Lakeisha Clay, the six-year-old daughter of Angela Clay, whose body was found in a separate bedroom from the bodies of the other two victims. The Defendant avers that there was insufficient evidence at either the guilt or sentencing phases of the trial as to the sequence of the murders; therefore, there was no evidence that Lakeisha Clay witnessed the murders of her mother and/or her sister.

The State contends that there was indeed sufficient evidence to support application of this statutory aggravating circumstance.

Two victims were in one bedroom and Lakeisha Clay was in a second bedroom of the small apartment. Witnesses established that the shots could be heard outside the apartment. The State avers that had Lakeisha been shot first, Lakeisha's mother, Angela Clay, would not have remained in her bed under the covers in a position where she could have been killed with a single gunshot wound to the head. There was no proof that Angela Clay had moved or been moved after she was shot. Even if Lakeisha did not visually witness the murders of her family, she certainly heard the gunshots. She could have identified the Defendant.

We are of the opinion that the proof supports a finding that Lakeisha's mother was shot first as she lay sleeping in her bed. Since the upstairs neighbors heard the gun blasts, Angela Clay would surely have awoken if the first shots fired had been those aimed at Lakeisha in the second bedroom. The proof is sufficient to support the finding of this aggravating circumstance.

■ Considering the validity of the remaining statutory aggravating circumstances [5], any error created by the insufficiency of the evidence to support the jury's finding on this contested circumstance is harmless and could not have created prejudice to the Defendant. A harmless error analysis may be applied to these circumstances. *State v. Bobo*, 727 S.W.2d 945, 956 (Tenn.1987); *State v. Cone*, 665 S.W.2d 87, 94 (Tenn.1984).

## XIII.

Defendant next avers that the trial court erred in denying his motion for a judgment of acquittal as to the "mass murder" statutory aggravating circumstance enumerated in T.C.A. § 39–2–203(i)(12). The jury found that the murder of Lakeisha Clay, Count Two, fell under the aggravating circumstance stated in Section 39–2–203(i)(12): "The defendant committed 'mass murder' which is defined as the murder of three or

---

**5.** The Defendant has not challenged three of the aggravating circumstances, T.C.A. §§ 39–2–203(i)(1), (2) and (7).

more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan."

■■■ The Defendant asserts that the "mass murder" statutory aggravating circumstance was inapplicable to the facts of this case and should not have been submitted to the jury. The Defendant correctly states that there is only one reported case where this Court has addressed the "mass murder" statutory aggravating circumstance. Defendant relies upon language found in *State v. Bobo*, 727 S.W.2d 945, 951 (Tenn.1987), that § 39–2–203(i)(12) pertains to "mass murders perpetrated over an extended but definite period" requires reversal by this Court because the proof in this case fails to show that the murders were committed over an "extended" period of time. As the State accurately points out, the above-cited phrase is *dicta*. In *State v. Bobo*, the defendant attacked the constitutionality of the mass murder aggravating circumstance because the subsection does not expressly require that the State show that a Defendant has been "convicted" of the murder of three or more persons and because the provision is ambiguous since it could be interpreted not to require conviction or it could be construed to require a showing of three or more convictions of murder. We agreed that there were two reasonable constructions of the statute. We then stated:

"We are of the opinion that while the language of T.C.A. § 39–2–203(i)(12) could be read to permit the State to present evidence of murders other than the defendant's record of convictions to show this aggravating circumstance beyond a reasonable doubt, such a construction would violate a number of State Constitutional guarantees, including the rights to a trial by an impartial jury, to an indictment or presentation, to confront witnesses against him, and against self-incrimination, all guaranteed by Article I, § 9, of the Tennessee Constitution. Essentially, therefore, such a construction would result in a procedure so unfair and prejudicial as to violate the

due process of law guaranteed by Article I, § 8, '[t]hat no man shall be taken or imprisoned, or deseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.' "

. . . . .

"In this case, in accordance with the established rule of statutory construction, we have concluded that T.C.A. § 39–2–203(i)(12) may be constitutionally applied if the triggering offenses are shown only by convictions that have been entered prior to the sentencing hearing at which they are to be utilized to establish this aggravating circumstance. 'We will not declare a statute unconstitutional when we are reasonably able to do otherwise—to preserve its meaning and purpose through a constitutionally correct construction. *See Williams v. Cothron*, 199 Tenn. 618, 288 S.W.2d 698 (1956).' *Mitchell v. Mitchell*, 594 S.W.2d 699, 702 (Tenn.1980)." 727 S.W.2d at 954–55.

We concluded by holding that, "for this section to apply, the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan." 727 S.W.2d at 956. In *State v. Bobo*, the third phrase, "within a period of forty-eight (48) months" was not called into question. We were dealing only with the first phrase, "that the Defendant had been *convicted* of three or more murders."

The language of the subsection "within a period of forty-eight (48) months," would be applicable to the kinds of serial murders committed by Wayne Williams in Atlanta, by the "Son of Sam" in New York, or by Theodore "Ted" Bundy in Florida. The language would also be applicable to multiple murders such as those committed by Charles J. Whitman by sniper fire from the tower on the University of Texas campus. The term "mass murderer" as used in the

statute can apply to multiple murders committed close in time or multiple murders committed singly over a longer period of time, not to exceed four years. We are of the opinion that the statute encompasses a situation where a defendant is simultaneously tried, as in the present case, for a series of separate but related homicides committed as part of a common scheme or plan.

## XIV.

■ The Defendant next alleges that the trial court erred by not granting him a new trial based upon the use at trial of his second tape recorded statement which was the result of the ineffective assistance of counsel during a pretrial custodial interrogation.

The trial court, at the conclusion of the hearing on the motion for new trial, discussed the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He stated, "In order to prevail, the defendant must show that both counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that but for counsel's unprofessional error, the results of the proceedings would have been different." He then cited *Strickland* and stated: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed, strategic choices made by the Defendant and on information supplied by the defendant."

The Court then stated that whether counsel's representation fell below an objective standard of reasonableness was a close question and one he need not decide because "even if I were to decide it fell below an objective standard of reasonableness, would the results of the proceeding been different, or is there a reasonable probability that the results of the proceeding would have been different.... I have no trouble in finding that the results of the proceedings would not have been different."

The record of the hearing on the motion for a new trial shows that Robert Skinner had been practicing law since 1961 and during that time his principle practice had been criminal defense work. He had handled thousands of criminal cases and had had more than ten homicide cases. He had represented the Defendant in the case involving the shooting of Bennie Clay but had refused to represent the Defendant in this case and had attempted to refer him to the Public Defender's office. Defendant still requested that Skinner assist him during this interview so Skinner consulted with Defendant and police officers about the status of the case. Skinner had an extended discussion with the Defendant regarding culpability and alibi. From his previous relationship with the Defendant, Skinner believed Defendant's protestations of innocence and felt that the best thing for the Defendant to do would be to clarify prior inconsistencies in his statements and completely, truthfully and accurately disclose his activities the evening of the murders. Defendant had already given a statement to police in which, contrary to his other statements, had placed him at the murder scene that night. He knew there were fingerprints on the telephones. He had made other inconsistent statements concerning his alibi. In his earlier statement, he stated he picked up Angela Clay at 10 p.m., took her home, and went to Charlotte Waldon's house for a late dinner. Charlotte Waldon had told officers he had been there earlier in the evening and left around 9:30 p.m.

From the record it appears that Defendant willingly talked with police after Skinner apprised him of the dangers of further interviews and that Skinner and the Defendant decided together that it was the best strategy for him to speak with officers and tell the truth and "clear up anything that he was going to stand by."

■ The advice given, or the services rendered by an attorney, must be within the range of competence demanded by attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). The mere fact that counsel advises an accused to

make a statement to the police does not constitute inadequate representation as a matter of law, *Phelps v. State*, 435 So.2d 158, 161 (Ala.Crim.App.1983), particularly where that advice makes it clear that the decision ultimately lies with the accused. *Commonwealth v. Kesting*, 274 Pa.Super. 79, 417 A.2d 1262, 1265 (1979). *See generally* Annot., "Adequacy of Defense Counsel's Representation of Criminal Client Regarding Confessions and Related Matters", 7 A.L.R.4th 180, § 19–20 (1981).

We are of the opinion that under the standard of *Strickland v. Washington* and *Baxter v. Rose*, counsel's representation does not require a new trial.

### XV.

As his last issue, the defendant asserts that, for several reasons, the Tennessee death penalty statute is unconstitutional under the state and federal constitutions. In support of his argument that the death penalty statute does not provide adequate guidance to the judge or jury, the defendant specifically contends that T.C.A. § 39–2–203(f) and (g) (1982) [6]: (1) have no prescribed standards of proof for determining whether statutory aggravating circumstances outweigh mitigating circumstances, (2) do not assign the burden of proof on the issue of whether aggravating circumstances outweigh mitigating circumstances, and (3) require a sentence of death if the jury finds that the statutory aggravating factors outweigh the mitigating factors. These specific contentions have been previously addressed and rejected by the Court in several cases. *See, e.g., State v. Boyd*, 797 S.W.2d 589, 597–99 (Tenn.1990); *State v. Thompson*, 768 S.W.2d 239, 252 (Tenn. 1989); *State v. Wright*, 756 S.W.2d 669, 675 (Tenn.1988); *State v. Melson*, 638 S.W.2d 342, 368 (Tenn.1982); *State v. Pritchett*, 621 S.W.2d 127, 141 (Tenn.1981); *State v. Dicks*, 615 S.W.2d 126, 131 (Tenn.

1981); *Houston v. State*, 593 S.W.2d 267, 276–277 (Tenn.1980).

Defendant also challenges that portion of § 39–2–203(g) (1982) which provides that, if the jury unanimously determines that at least one or several statutory aggravating circumstances have been proved by the State beyond a reasonable doubt and are not outweighed by any mitigating circumstances, "the sentence *shall* be death." (Emphasis supplied.) Defendant contends that this portion of the statute violates Article I, § 19, of the Tennessee Constitution. This section of our Constitution's Declaration of Rights, like the First Amendment to the Federal Constitution, guarantees freedom of speech and of the press. The last clause of the final sentence of Article I, § 19, requires that "in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases." Defendant contends that the "shall" language of § 39–2–203(g), which was instructed by the trial court in the present case, deprives the jury of its constitutional powers under Article I, § 19, to impose its own decision.

This section of Article I, § 19, with some changes, has been part of the Declaration of Rights found in the constitutions of Tennessee since 1796. It apparently derived from essentially identical language in Article IX, § 7, of the Pennsylvania Constitution of 1790. *See* L. Laska, *A Legal and Constitutional History of Tennessee, 1772–1972*, 6 Mem.St.U.L.Rev. 563, 582, n. 89 (1976); *see also* 8 Swindler, *Sources & Documents of United States Constitution*, p. 292 (1979). During the last half of the seventeenth century in England and this country, it was disputed whether in trials on indictments for seditious libels the jury had the right to return a general verdict of guilty or not guilty.[7] Some English

---

**6.** These sections were amended after the trial of this case to require that the State prove that the statutory aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. T.C.A. § 39–2–203(f) and (g) (1990 Supp.).

**7.** For the history of the events leading to the adoption of the last sentence of Article I, § 19, and similar constitutional provisions in other states, see *Harris v. State*, 75 Tenn. 538, 544–548 (1881); *Commonwealth v. McManus*, 143 Pa. 64, 22 A. 761 (1891) (Mitchell, J., concurring); Howe, *Juries as Judges of Criminal Law*, 52

and American judges had held that the jury could only find the fact of publication and the truth of the innuendoes but that the question of guilt or innocence in these cases was a matter of law solely for the court since the terms of the alleged libel were in writing and not subject to dispute and the intent was claimed as a legal inference. This doctrine had placed freedom of speech and of the press at the mercy of judges appointed by the crown and was particularly incompatible with the democratic values espoused by the new nation. The adoption of Article IX, § 7, of the Pennsylvania Constitution in 1790 and the passage of Fox's Libel Act (32 Geo. III, c. 60) by Parliament in 1792 were intended to affirm the right of the jury in all prosecutions for seditious libel to judge the law and the facts as in other criminal cases.

The intended effect of this constitutional language upon the criminal law was explained in *Harris v. State*, 75 Tenn. at 547–548:

> In view of this history, and the contest that had been had in England over the question, when the Constitution of 1834 was framed, when providing for the freedom of the press and freedom of speech, in the Bill of Rights was inserted the section quoted, and the principle of Mr. Fox's Libel Bill was embodied—that "in all indictments for libel, the jury shall have the right to determine the law and the facts"—not as they may think the law is, but "under the direction of the court, as in other criminal cases." In plain words, should determine the law and the facts as they did in a trial for murder, or for larceny, or any other crime. How was that? By the immemorial traditions of the common law, and the universal custom of the courts administering that law, the court instructing the jury as to what the law was, what were the legal elements of the of-

fense, and the jury finding the party innocent or guilty, as they in their judgment found these elements in the act of the party charged; that is, they, under the direction of the court, said whether he was legally guilty—tried him by the law of the land, that law given them by the court for their guide—and then, under our system, if convicted, the instructions, if erroneous in a matter affecting the rights of the prisoner, could be reviewed, and the case reversed and remanded for a new trial, that the law may be correctly given for the guidance of the jury, and if convicted at all, be convicted according to law. This is all that was intended, and all the language of the Constitution, fairly interpreted, means. *It was not intended, nor does it change the ancient province and rights of a jury in criminal cases,* but only to give the jury, or rather to secure to the jury, the right to do in libel cases precisely what they had always done in other criminal cases, to act under the instructions of the court, and judge of the application of the law given to them to the facts proven, and declare the result, either to be innocent or guilt, as the legal elements defined by the court are proven to exist or the contrary. (Emphasis supplied.)

Even more recently, this Court has reiterated that a constitutional provision like that in Article I, § 19, "is in the main declaratory of the common law" and not meant to enlarge or extend the traditional province of the jury. *Dykes v. State*, 201 Tenn. 65, 296 S.W.2d 861, 863 (1956).

There has been some dispute as to the precise role of the jury under Article I, § 19, as judge of the law in determining the guilt of an accused.[8] *See Ford v. State*, 101 Tenn. 454, 47 S.W. 703 (1898); *Harris v. State, supra;* Howe, *supra* n. 2, 52 Harv.L.Rev. at 598–601. It is well rec-

Harv.L.Rev. 582, 584–588 (1939); 38 Ann.Cases 1915D, 1261–1263.

**8.** In this regard, the Court has held that the use of "should" and "will" in instructions given at the guilt phase of a first degree murder trial does not violate Article I, § 19. *State v. Taylor*, 771 S.W.2d 387, 396–397 (Tenn.1989). *Cf.*

*Wright v. State*, 217 Tenn. 85, 394 S.W.2d 883, 886 (1965) (instruction that jury were judges of the law and the facts and that, if they found the requisite prior convictions, "the verdict would be" that defendant was guilty of being a habitual criminal, did not violate Article I, § 19).

ognized, however, that the right to have the jury assess punishment was not part of the right of trial by jury at common law. *Woods v. State*, 130 Tenn. 100, 107, 169 S.W. 558, 559 (1914); *see also Hunter v. State*, 496 S.W.2d 900, 902 (Tenn.1972); *Corlew v. State*, 181 Tenn. 220, 224, 180 S.W.2d 900, 901 (1944). The power to declare the appropriate punishment for a crime and the mode for assessment of that punishment was within the power of the legislative body, which might assign that duty to the judge or the jury or to both, while mandating a particular sentence or granting various degrees of discretion to the sentencer. *State v. Latham*, 136 Tenn. 30, 38, 188 S.W. 534, 536 (1916); *Woods v. State*, 130 Tenn. at 107, 169 S.W. at 559. In fact, at common law death was mandatory punishment for all convicted murderers. *McGautha v. California*, 402 U.S. 183, 197–195, 91 S.Ct. 1454, 1462–1463, 28 L.Ed.2d 711 (1971).

In light of these facts, it is clear that the mandate of the last sentence of Article I, § 19, was not meant to and does not affect the sentencing and punishment of criminal defendants.[9] While it is indisputable that the power of the General Assembly to prescribe the procedures and guidelines of capital sentencing may be subject to constitutional restraints, the final clause of Article I, § 19, is not among these.[10]

In addition to presenting the issues raised by the defendant regarding the constitutionality of the statutory guidelines for determining whether death is an appropriate penalty, this case also affords the Court the opportunity to re-examine the constitutionality of the death penalty itself under Article I, § 16, of the Tennessee Constitution.[11] We are assisted in this

analysis not only by the briefs of the defendant and the State but also by amicus briefs filed by the Capital Case Resource Center of Tennessee and the Tennessee District Attorneys General Conference.

Over a decade ago, in 1979, the Court in *Cozzolino v. State*, 584 S.W.2d 765, 767 (Tenn.1979), examined the constitutionality of the death penalty under Article I, § 16, and concluded:

> Without detailing the precise scope of the protection afforded by that clause, we hold that it places no greater restriction on the punishments that may be imposed by this state than does the federal constitution.

In *State v. Austin*, 618 S.W.2d 738, 741 (Tenn.1981), the Court reiterated that

> there is nothing in either the state or the federal constitution, historically or otherwise, which precludes the imposition of the death penalty in accordance with the procedures and under the circumstances provided for in the present statutes of the state.

In the ten years since these decisions, the Court has consistently adhered to the position that the death penalty is not a *per se* violation of Article I, § 16. *See, e.g., Houston v. State*, 593 S.W.2d 267, 276 (Tenn. 1980); *State v. Laney*, 654 S.W.2d 383, 389 (Tenn.1983); *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984); *State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn.1984); *State v. Porterfield*, 746 S.W.2d 441, 451 (Tenn. 1988); *State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988); *State v. Alley*, 776 S.W.2d 506, 518 (Tenn.1989); *State v. Boyd*, 797 S.W.2d 589, 599 (Tenn.1990). We continue to abide by this interpretation of the Tennessee Constitution, but, in light of the

---

**9.** It is of note that at the time of the Constitution of 1870, in trials for first degree murder the judge had the power to disregard the jury's finding of mitigating circumstances and recommendation of a life sentence and sentence the defendant to death. *See Leach v. State*, 99 Tenn. 584, 597, 42 S.W. 195, 198 (1897); *Lancaster v. State*, 91 Tenn. 267, 290, 18 S.W. 777, 782 (1891), *Greer v. State*, 62 Tenn. 321, 324 (1874); *Lewis v. State*, 40 Tenn. 127, 148–150 (1859).

**10.** Our holding should not be construed to mean that the jury at a capital sentencing hearing

need no longer be charged that it is the judge of the facts and the law as it applies to the facts under the direction of the court. This instruction remains necessary under the statutory sentencing scheme adopted by the General Assembly.

**11.** Article I, § 16 provides: "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

increasing importance of state constitutional law in capital jurisprudence, *see, e.g.,* J. Acker and E. Walsh, *Challenging the Death Penalty under State Constitutions,* 42 Vand.L.Rev. 1299 (1989), we take this opportunity to set forth in more detail our analysis of this issue under Article I, § 16.

■ Initially we recognize that, although the Eighth Amendment to the Federal Constitution and Article I, § 16, are textually parallel, this does not foreclose an interpretation of the language of Article I, § 16, more expansive than that of the similar federal provision. *See California v. Greenwood,* 486 U.S. 35, 50, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988); *California v. Ramos,* 463 U.S. 992, 1013–1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983); *Doe v. Norris,* 751 S.W.2d 834, 838 (Tenn.1988); *Miller v. State,* 584 S.W.2d 758, 760 (Tenn. 1978). Our analysis of this issue, however, does not yield results different from those reached by the United States Supreme Court and of almost all of our sister courts.[12]

The legislative and constitutional history of Tennessee indicates a clear intent that the death penalty is in some cases an appropriate form of punishment. Article I, § 8, provides:

> That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land. (Emphasis supplied.)

Article I, § 15, states in part:

> That all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or the presumption great. (Emphasis supplied.)

The underlined language has been included in each of Tennessee's three constitutions and it is undisputed that the framers of our constitutions recognized the acceptability of capital punishment. As stated earlier, the common law rule mandated death for all convicted murderers; and, except for one brief period from 1915 to 1917, the death penalty has been the statutorily sanctioned punishment for the offense of first degree murder in Tennessee.[13] As is apparent, then, since the founding of this state both constitutions and legislative enactments have contemplated the imposition of the death penalty; and nothing in the constitutional or legislative history of this State mandates that death is invalid *per se* as cruel and unusual punishment under Article I, § 16.

■ Historical· and legislative acceptance of a mode of punishment, while significant, should not be dispositive when deciding whether a punishment violates Tennessee's constitutional prohibition against cruel and unusual punishment. To so hold would both limit the organic law of the constitution to the moral sentiments of its drafters and risk subjecting individuals to the abuse of legislative power. *See Gregg v. Georgia,* 428 U.S. 153, 174, n. 19, 96 S.Ct. 2909, 2925, n. 19, 49 L.Ed.2d 859 (1976) (plurality opinion); *Trop v. Dulles,* 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958) (plurality opinion); *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 211 (1987). The very generality of the terms "cruel and unusual" indicates that, like the

---

**12.** See 42 Vand.L.Rev., *supra,* at 1331, n. 151, for a list of decisions by state courts rejecting the contention that capital punishment is *per se* unconstitutional under their state constitutions. When the state supreme courts of California and Massachusetts declared the death penalty *per se* invalid under the state constitution, the voters amended the state constitution to allow the imposition of capital punishment.

**13.** *See* Public Acts 1829, Ch. 23, § 4 (mandatory death by hanging); Public Acts 1837–1838, Ch. 29; Code 1858, § 4601; Public Acts (Extra Session) 1913, Ch. 36; Public Acts 1915, Ch. 181 [abolishing death penalty except for rape or where defendant already serving life term]; Public Acts 1917, Ch. 14, and Public Acts 1919, Ch. 5, § 1 [reinstating death penalty]; Public Acts 1973, Ch. 192, § 2; Public Acts 1974, Ch. 462, § 3; Public Acts 1977, Ch. 51. From time to time in Tennessee the death penalty has been considered appropriate punishment for other crimes, such as a second offense for simple larceny, forgery, perjury, arson or horse stealing, Public Acts 1807, Ch. 73, §§ 2, 4; kidnapping, Public Acts 1935, Ch. 49, § 1; rape, Public Acts 1871, Ch. 56, § 1; Public Acts 1974, Ch. 461; and armed robbery, Public Acts 1955, Ch. 72.

framers of the Federal Constitution, the authors of Tennessee's fundamental law delegated the task of defining these terms to the courts. *See Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 2691, 101 L.Ed.2d 702 (1988).

The exact standards to be used to determine whether a legislatively approved punishment is cruel and unusual under the Tennessee Constitution have never been set forth by the courts of this state. Indeed, there are few published cases involving constitutional challenges under Article I, § 16. These prior cases for the most part appear to equate the requirements of Article I, § 16, with those of the Eighth Amendment. *See, e.g., State v. Busler,* 704 S.W.2d 310, 312–313 (Tenn.1986); *Cozzolino v. State,* 584 S.W.2d at 767; *Collins v. State,* 550 S.W.2d 643 (Tenn.1977); *Canupp v. State,* 197 Tenn. 56, 270 S.W.2d 356 (1954); *State v. Dobbins,* 754 S.W.2d 637, 644 (Tenn.Crim.App.1988); *State v. Summers,* 692 S.W.2d 439, 442–444 (Tenn. Crim.App.1985).

■ While not required to follow the standards applied under the federal constitution, *see Miller v. State, supra,* we adhere to the analysis in *Gregg v. Georgia,* 428 U.S. at 173, 96 S.Ct. at 2925, particularly as followed by the New Jersey Supreme Court in *State v. Ramseur,* 524 A.2d at 210–216; and find persuasive the reasoning of both decisions. *See also Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 968–969 (1982); *State v. Campbell,* 103 Wash.2d 1, 691 P.2d 929, 946–948 (1984). Under the test of *Gregg,*

> [t]hree inquiries are required. First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense?

Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective.

*State v. Ramseur,* 524 A.2d at 210 (citing *Gregg v. Georgia,* 428 U.S. at 173, 96 S.Ct. at 2925).[14]

■ In determining whether the death penalty conforms with contemporary standards of decency, we note that there is nothing to indicate that the majority of contemporary Tennesseans consider the death penalty *per se* an inappropriate punishment for first degree murder. Indeed, the amicus brief of the Capital Case Resource Center admits that public opinion throughout the United States favors the death penalty as a punishment for first-degree murder.

That Tennesseans find the death penalty acceptable is clearly evidenced by the actions of the General Assembly, that branch of government most representative of and responsive to the views of the people of this state.[15] When the United States Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and this Court's decisions in *State v. Hailey,* 505 S.W.2d 712, 714–715 (Tenn.1974), and *Collins v. State,* 550 S.W.2d 643, 646–647 (Tenn.1977), rendered unconstitutional Tennessee's statutes setting death as the punishment for first degree murder, the General Assembly responded with passage of new acts attempting to cure the constitutional infirmities found in these cases and sought, like over three quarters of the state legislatures of this nation, to maintain the death penalty as punishment for first degree murder. More recently, the punishment was retained as part of the Revised Criminal Code

---

**14.** This method of analysis has been followed by the United States Supreme Court in subsequent cases determining whether death is cruel and unusual punishment under certain specific circumstances. *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2953–2958, 106 L.Ed.2d 256 (1989) (mentally retarded defendant); *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (juvenile defendant); *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1771–1782, 95 L.Ed.2d 262 (1987) (racial discrimination); *Ford v. Wainwright,* 477 U.S. 399,

106 S.Ct. 2595, 2599–2602, 91 L.Ed.2d 335 (1986) (plurality decision) (insane person).

**15.** The legislative restrictions forbidding the death penalty when the defendant is a minor, T.C.A. § 37–1–134(a)(1)(A) (1990 Supp.), or mentally retarded, T.C.A. § 39–13–203 (1990 Supp.), illustrate the legislature's performance of its role to reflect contemporary attitudes regarding capital punishment.

of 1989. *See* Public Acts 1989, Ch. 591, § 1.

Nor, as the amicus brief suggests, does the absence of executions in Tennessee support the position that contemporary feeling, despite legislative approvals, is in reality against the death penalty. As this Court can take judicial notice, juries, even more direct representatives of the contemporary mores of Tennesseans than the legislature, continue to impose the death penalty, and over eighty juries have imposed the death penalty since the present statute was enacted in 1977. Further, the absence of executions in Tennessee has more to do with the complexities of the law and the legal system than with any public animus against death as a penalty. *Cf. State v. Ramseur*, 524 A.2d at 212.

A second prong of our analysis is whether the punishment is grossly disproportionate to the crime. *See, e.g., State v. Busler*, 704 S.W.2d at 312–313 (applying a proportionality analysis to a habitual criminal sentence of life). While death may be disproportionate *per se* when the offense does not involve the death of the victim, *see, e.g., Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), or the defendant neither killed nor had an intent to kill nor contemplated the use of lethal force by others, *see Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), this is not true when the crime is first-degree murder. As stated in *Gregg v. Georgia*, 428 U.S. at 187, 96 S.Ct. at 2932,

> when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes.

The last consideration in determining whether death is cruel and unusual under Article I, § 16, is whether it goes beyond what is necessary to accomplish any legitimate penological objective. The two factors most often cited in support of the death penalty are general deterrence and retribution. Whether the death penalty serves as a general deterrent to crime is a subject of continuing debate, *see Gregg v. Georgia*, 428 U.S. at 184–186, 96 S.Ct. at

2930–2931; *see also* Acker & Walsh, 42 Vand.L.Rev. at 1326, n. 134; and a factor properly left to the legislative branch of government. *State v. Ramseur*, 524 A.2d at 215–216. While increasingly questioned, retribution remains a valid penological justification for the death penalty.

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

*Gregg v. Georgia*, 428 U.S. at 183, 96 S.Ct. at 2930. Channeling man's natural instinct for retribution "serves an important purpose in promoting the stability of a society governed by law" for "the seeds of anarchy are sown" when "people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve.'" *Furman v. Georgia*, 408 U.S. at 308, 92 S.Ct. at 2761 (Stewart, J., concurring).

We have engaged in an indepth analysis of the rationale underlying our holding that the death penalty does not *per se* violate Article I, § 16, of the Tennessee Constitution in order to clarify both our holding and the parameters of Article I, § 16. We acknowledge the serious and compelling arguments presented on this appeal as to why death is an unacceptable punishment in any case of first-degree murder. Most of these assertions, however, are subject to legitimate disagreement and are purely matters for the legislature's consideration. As this Court concluded in *State v. Barber*, 753 S.W.2d at 670, "[t]he issue of whether or not the death penalty constitutes cruel and unusual punishment is, in the last analysis, a moral question which has been resolved in this State by our Legislature as the representative of the people." It is not the role of this Court to "superimpose personal morality" in difficult issues, *State v. Campbell*, 691 P.2d at 948, nor to act as "a good reflex of a democratic society." *Dennis v. United States*, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). For these reasons, we reaffirm the prior holdings of this

Court that the death penalty does not *per se* violate Article I, § 16, of the Tennessee Constitution.

▮ We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205 (1982) and are satisfied that the evidence warrants imposition of that penalty. Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. Defendant deliberately killed an innocent, helpless, frightened child. His acts were those of a cold-blooded executioner who showed a total disregard for human life. This brutal and senseless murder places the Defendant Black into the class of defendants deserving capital punishment and is not disproportionate to sentences imposed in similar cases. *See, State v. Barber*, 753 S.W.2d 659 (Tenn.1988). The sentence of death will be carried out as provided by law on the 15th day of October, 1991, unless otherwise ordered by this Court or by other proper authority. The life sentences in Counts I and III, plus five years, to run consecutively to each other, and consecutive to the death sentence imposed in Count II, and the 15 years for burglary with a firearm are affirmed.

O'BRIEN and ANDERSON, JJ., concur.

REID, C.J., and DAUGHTREY, J., concur in part and dissent in part. See separate opinion.

REID, Chief Justice, concurring in part and dissenting in part.

I concur in the holding of the majority that the verdict of guilty be affirmed, but I would reverse the sentence and remand for a resentencing hearing on the grounds that the evidence is insufficient to support two of the aggravating circumstances found by the jury, T.C.A. § 39–2–203(i)(5) and (12), and that the aggravating circumstance in subsection (5) is unconstitutionally vague as applied to the facts of this case. Furthermore, I would remand the case to the trial court to afford the defendant the opportunity to present evidence on the allegation that electrocution as a means of imposing the death penalty is cruel and unusual punishment in violation of Article I, § 16 of the Tennessee Constitution.

Because, in my view, these errors require a remand for resentencing, it is unnecessary to determine if the death penalty per se violates the Tennessee Constitution. That issue should be reserved until the Court is presented a case in which there are no other issues requiring reversal of the sentence. Considerations of judicial economy and restraint command this approach, *see Beck v. Puckett*, 2 Tenn. Cases 490, 494–95 (1877), and it is a settled rule that this Court will not pass on the constitutionality of a statute unless absolutely necessary for the determination of the case. *State v. Murray*, 480 S.W.2d 355, 357 (Tenn.1972); *State ex rel. West v. Kivett*, 203 Tenn. 49, 308 S.W.2d 833, 835–37 (1957).

Any discussion of the death penalty must begin with the recognition that the defendant's wanton and brutal acts have caused the untimely and unnecessary death of a human being and have caused inestimable damage to the fragile fabric of society. Because the defendant's acts have extinguished the victim's life, the law is helpless to aid the victim directly. In recognition of the wrong to the victim, the law does provide its best, though obviously inadequate, means of redress and restitution to the victim's family against the perpetrator and his estate. Since almost all persons sentenced to death are indigent, this, again, is little more than a meaningless gesture.

Since the right and responsibility to punish for crimes committed lies with the law and not with the victim or his or her family, the law then must address the proper treatment of the defendant. In this regard, the law has two responsibilities—the defendant and society. Historically, society's rights have been vindicated by retribution, life for life, tooth for tooth, and stripe for stripe. 4 W. Blackstone, *Commentaries* *13. Of late, the law has found justification for punishment in deterrence of others. *See, e.g.,* T.C.A. § 40–35–103(1)(B).

In a capital case, the law's obligations to the defendant require that "[f]or purposes of imposing the death penalty, [the defendant's] ... punishment must be tailored to his personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982). The criminal sentence must be directly related to the offender's personal culpability. *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 1683, 95 L.Ed.2d 127 (1987). "[T]he sentence imposed ... should reflect a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (concurring opinion) (emphasis in original).

In all of this, the limit to which the law can go in imposing punishment upon the defendant in retribution for his crime and for the benefit of society is set forth in the federal and state constitutions. That limit is "cruel and unusual punishments." U.S. Const. amend. VIII; Tenn. Const. Art. I, § 16.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court failed to find that the death penalty per se is cruel and unusual punishment forbidden by the Eighth Amendment to the United States Constitution. However, it did indicate in *Furman* that the imposition of the death penalty by any procedure which allows the sentencer standardless discretion in deciding who lives and who dies was cruel and unusual punishment. The decisions in *Furman; Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and their companion cases resulted in a flurry of legislative activity in Tennessee during the years from 1973 through 1977 in an attempt to ensure that Tennessee's death penalty statute complied with the federal constitution. In response to *Gregg v. Georgia*, the General Assembly passed the present capital sentencing statute. No court has found that this statute, by its terms, offends the minimum standards set by the federal constitution.

A study of the case law over the past decade, however, reveals that there has been no meaningful review of the death penalty and the state statute under the Tennessee Constitution. The United States Supreme Court has acknowledged that the federal constitution states only the minimum standard, the floor, and that the states are free to provide greater protections in their criminal justice systems than the federal constitution requires. *California v. Ramos*, 463 U.S. 992, 1013–1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983); *see also California v. Greenwood*, 486 U.S. 35, 50, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Sibron v. New York*, 392 U.S. 40, 60–61, 88 S.Ct. 1889, 1901–1902, 20 L.Ed.2d 917 (1968). This Court has acknowledged its authority to hold that the Tennessee Constitution provides protection of a defendant's rights beyond the comparable federal constitutional guarantees. *See Doe v. Norris*, 751 S.W.2d 834, 838 (Tenn.1988); *Miller v. State*, 584 S.W.2d 758, 760 (Tenn. 1979).

The United States Supreme Court has also found that "an evolving sense of decency" determines the standard of protection afforded. By definition, an evolving sense of decency means a developing standard of dignity and respect. This Court has not decided if our constitutional standard for imposing the sentence of death is, like the federal, an evolving standard. It has not pronounced an "evolving standard of decency" in Tennessee that determines the validity of punishment imposed under our own constitution. For example, in *Cozzolino v. State*, 584 S.W.2d 765, 767 (Tenn. 1979), the Court refused to detail "the precise scope of the protection afforded" by Article I, § 16 but concluded that it "places no greater restriction on the punishments that may be imposed by this state than does the federal constitution."

In accord with this doctrine, the Court appears to have continued to affirm sentences of death by ascertaining whether

procedural and substantive law satisfies the latest national minimum standard. *See, e.g., State v. Alley,* 776 S.W.2d 506, 518 (Tenn.1989) (adopting federal standard for appellate review of excusal of jurors for cause because of their views on the death penalty); *State v. West,* 767 S.W.2d 387, 396–397 (Tenn.1989) (adopting broadest power of appellate review suggested in *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986)); *State v. Smith,* 755 S.W.2d 757, 768 (Tenn.1988) (accepting *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) on the use of felony murder as an aggravating circumstance); *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn.1988) (assuming comparative proportionality review is not required by the State Constitution, following *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)); *State v. Porterfield,* 746 S.W.2d 441, 450–451 (Tenn.1988) (following *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)). In effect, the only standards in Tennessee have been those announced by the United States Supreme Court as required by the federal constitution.

Yet the standards applied by the United States Supreme Court are torn by tension between *Gregg*'s requirement of channelled and guided discretion to achieve measured, consistent application of the penalty in a manner designed to rationally distinguish those for whom death is an appropriate sanction and the commandment of cases like *Woodson,* 428 U.S. at 280, 96 S.Ct. at 2978; *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which hold that sentencing must be individualized and, therefore, that the sentencer must not be precluded from considering any mitigating factor. *See Walton v. Arizona,* 497 U.S. ——, 110 S.Ct. 3047, 3058–3068, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring); *State v. Dicks,* 615 S.W.2d 126, 133–134 (Tenn.1981) (Brock, J., dissenting). Despite the court's pronouncements that there must be "heightened reliability" to ensure "the fundamental respect for humanity underlying the Eighth Amendment," *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991, the only settled principle of federal jurisprudence appears to be "a life for a life." *See Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Such "legal doctrine-making in a state of nervous breakdown," as Weisberg describes the current state of Eighth Amendment jurisprudence in *Deregulating Death,* 1983 Sup. Ct.Rev. 305, 306 (1983), accentuates the critical role of state courts in capital punishment cases. *See* Acker & Walsh, *Challenging the Death Penalty Under State Constitutions,* 42 Vand.L.Rev. 1299 (1989).

Tennessee constitutional standards are not destined to walk in lock step with the uncertain and fluctuating federal standards and do not relegate Tennessee citizens to the lowest levels of constitutional protection, those guaranteed by the national constitution.

Indeed, the General Assembly has clearly indicated that when a defendant's life is at stake, citizens of Tennessee are entitled to greater protections than those guaranteed by the United States Constitution. Recognizing higher standards than the United States Supreme Court has found in the federal constitution and reflecting a higher "contemporary standard of decency" in Tennessee, the legislature has forbidden the execution of persons who are under the age of eighteen, T.C.A. § 37–1–134(a)(1), and who are mentally retarded, T.C.A. § 39–13–203. *Compare Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Eighth Amendment is not violated by imposition of death on sixteen and seventeen year olds); *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Eighth Amendment does not prohibit subjecting mentally retarded defendant to death penalty). Likewise, although the federal constitution does not require comparative proportionality review, *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the General Assembly has mandated under T.C.A. § 39–13–206(c)(1)(D) [previously § 39–2–205(c)(4)] that in reviewing a sentence of death for murder in the first degree, this Court must determine whether the sen-

tence of death imposed in each case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."

Comparative proportionality review is a means of insuring against the arbitrary imposition of the death penalty and assuring that capital sentencing in Tennessee reflects the "evolving standard of decency" in this state. By the enactment of this statute, the General Assembly has required this Court to focus on the accused and compare the circumstances of his offense with those of other first degree murders. The question of traditional proportionality seeks to ascertain whether the punishment of death is proportional to the gravity of the specific crime for which it is being imposed. The comparative proportionality analysis mandated by the statute requires that this Court examine on a state-wide basis the sentences imposed in all first degree murder cases and, as necessary, in factually similar homicides. The Court must determine whether the procedures designed to curb arbitrariness and capriciousness in capital sentencing have failed to exclude from that sentence the defendant "whose crime does not seem so aggravated when compared to those of many who escaped the death penalty." Kaplan, *The Problem of Capital Punishment*, 1983 U.Ill.L.Rev. 555, 576. Such review was designed to assure, "at least on a statewide level, that the death penalty is not imposed in an arbitrary fashion." Raybin, *New Death Penalty Statute Enacted*, Judicial Newsletter, University of Tennessee College of Law, at 11 (May 1977). This review identifies "the most extreme examples of disproportionality among similarly situated defendants" thereby serving "to eliminate some of the irrationality that currently surrounds imposition of a death sentence." *Pulley v. Harris*, 465 U.S. at 70, 104 S.Ct. at 890 (Brennan, J., dissenting).

Comparative proportionality review requires the articulation of "standards of decency" as they exist and evolve in Tennessee. It has been commented that "a single jury may not accurately reflect dominant community sentiment" since, while juries are designed to represent the community, "voir dire and peremptory and cause challenges can skew a jury's cross-sectional character" and since even a jury representative of the local community "is not necessarily attitudinally representative of the population of a state taken as a whole." Goodpaster, *Judicial Review of Death Sentences*, 74 J.Crim.L. & Criminology 786, 798 (1983). Review of death sentences undertaken with a broad awareness of the decisions made by a number of juries across Tennessee in assessing whether death is an appropriate punishment assures that capital punishment is inflicted only where consistent with the prevailing standards of this state as represented by its citizens' consensus and therefore only where appropriate under Art. I, § 16 of the Tennessee Constitution.

With the aid of the information available under our Supreme Court Rule 12, this Court can assure by a rigorous and thorough comparative review of each capital case that the death penalty is rationally, and therefore constitutionally, imposed in those few cases in which the people of this state agree that the ultimate sanction is warranted.

Under these circumstances, particularly in light of the nature of the punishment, the imperfection of the judicial system, and the broad discretion vested in the district attorneys general of this State, *see State v. Dicks*, 615 S.W.2d at 136, 140–141, this Court should assert its full and independent authority under the State Constitution to assure that the process whereby a defendant is sentenced to death is essentially free of error. This Court, through the exercise of strict appellate review, must require stringent and exact compliance with the Tennessee Constitution and state statutes. The United States Supreme Court has repeatedly emphasized the importance of meaningful appellate review to protect against the unlawful imposition of the death penalty. *See Zant v. Stephens*, 462 U.S. 862, 876, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *Barclay v. Florida*, 463 U.S. 939, 973, 103 S.Ct. 3418, 3437, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring) ("the question is whether, in its regu-

lar practice, the Florida Supreme Court has become a rubber stamp for lower court death-penalty determinations").

## I.

With these principles as guidance, I now address the narrow issues of the constitutionality of certain aggravating circumstances found in this case and the sufficiency of the evidence to support them. The jury is required to consider the aggravating and mitigating circumstances to determine if death is an appropriate sanction in this case. The purpose of this consideration under federal law is to direct and limit the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action" and to prevent the jury from imposing the death penalty in an unreasoned, emotional reaction to the murder. *Gregg v. Georgia*, 428 U.S. at 189, 96 S.Ct. at 2932; *California v. Ramos*, 463 U.S. at 999, 103 S.Ct. at 3452. The jury must examine "the character of the individual and the circumstances of the crime," *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2744, and the defendant's "personal responsibility and moral guilt," *Enmund v. Florida*, 458 U.S. at 801, 102 S.Ct. at 3378, measured against the conscience of the community. *See Caldwell v. Mississippi*, 472 U.S. 320, 333, 105 S.Ct. 2633, 2641, 86 L.Ed.2d 231 (1985) (the jury decides whether another should die "on behalf of the community").

As one of six aggravating circumstances, the jury in this case found that the murder of Lakeisha Clay satisfied the conditions of T.C.A. § 39–2–203(i)(5) (1982). The defendant contends that this circumstance is unconstitutionally vague. Aggravating circumstance (i)(5) requires that a murder involve "torture" or "depravity of mind" for it to be "especially heinous, atrocious or cruel." The trial court in the present case instructed the jury on the definitions of these terms as established by this Court in *State v. Williams*, 690 S.W.2d 517 (Tenn. 1985). The majority states, "The trial court's definitions of the terms removed any vagueness and narrowed the class of persons eligible for the death penalty." The opinion contains no further analysis of this aggravating circumstance, nor was

there any analysis made in the prior decisions relied upon for this holding.

In *Williams*, "torture" was defined as the "infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." 690 S.W.2d at 529. *Williams* also implies that the infliction of such pain must be willful. *Id.* There is not any evidence in the record to support a finding that the victim in the present case suffered torture under this definition. The proof shows that Lakeisha Clay was shot twice and that she may have been conscious at this time, but such evidence is insufficient to support a finding of torture within the meaning of circumstance (i)(5). *See Williams*, 690 S.W.2d at 530; *State v. Pritchett*, 621 S.W.2d 127, 137–139 (Tenn.1981).

Circumstance (i)(5) may also be proved by showing "depravity of mind." Proof of torture *ipso facto* establishes depravity of mind because the mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved. *Williams*, 690 S.W.2d at 529. As just said, there is no torture in this case upon which to base a finding of depravity. In *Williams* this Court held, however, that depravity may exist in the absence of torture without specifying those circumstances which established such "depravity of mind." *Id.* The Court simply defined "depravity" as "moral corruption; wicked or perverse act." *Id.* Even though the jury in this case was instructed in these exact words, they were given no real guidance.

An examination of the dictionary definitions of the three terms meant to clarify the term "depravity" so that it might be used to guide and channel the jury's discretion reveals that "corruption" and "wicked act" are so synonymous with "depravity" that they serve no limiting or clarifying function. Likewise, "perverse" means simply that the object or action described is "directed away from what is right or good." *See The American Heritage Dictionary of the English Language* (1970). It, too, in no way guides the jury's discretion to those first degree murders in which

death is warranted since any first degree murder is neither good nor right.

An examination of cases subsequent to *Williams* in which this aggravating circumstance was used to support a sentence of death discloses no further clarification or limitation of the meaning of "depravity of mind." *See, e.g., State v. Teel,* 793 S.W.2d 236, 251 (Tenn.1990); *State v. Payne,* 791 S.W.2d 10 (Tenn.1990); *State v. Alley,* 776 S.W.2d 506 (Tenn.1989); *State v. Henley,* 774 S.W.2d 908 (Tenn.1989); *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989); *State v. Barber,* 753 S.W.2d 659, 668–669 (Tenn.1988); *State v. Porterfield,* 746 S.W.2d 441, 449 (Tenn.1988); *State v. McNish,* 727 S.W.2d 490, 494 (Tenn.1987); *State v. Cooper,* 718 S.W.2d 256, 259 (Tenn.1986); *State v. Hartman,* 703 S.W.2d 106, 119 (Tenn.1985). It is unclear from these cases whether they involve torture or something more. The key factors used to test for this aggravating circumstance are also unclear. One commentator states that they "appear to be" the length of time used to kill, the defendant's attitude during the killing, the victim's consciousness and realization of impending death, the dangerousness of the instrumentality used to inflict death, the number of blows, and several other factors. S. Feldman, *Criminal Offenses and Defenses in Tennessee* 75 (1990 Supp.). There is no analysis of such factors in this case.

It is notable that this circumstance was amended during the recent revision of the criminal code. The phrase "depravity of mind" was deleted from that statute, and circumstance (i)(5) is now limited to murders involving "torture or serious physical abuse beyond that necessary to produce death." T.C.A. § 39–13–204(i)(5).

In this case, where there was no evidence of torture, the jury received no guidance in determining whether the defendant's mind was materially "depraved" beyond that of any first-degree murderer. *See State v. Hines,* 758 S.W.2d 515, 524 (Tenn.1988). It appears that in cases not involving torture this Court has failed to supply on appellate review a principled definition of T.C.A. § 39–2–203(i)(5) adequate to satisfy the re-quirements of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); and Article I § 16, of the Tennessee Constitution.

The United States Supreme Court has made it clear that aggravating circumstances requiring that a murder be "especially heinous, atrocious, or cruel" need not be construed to require torture or serious physical abuse. *See Maynard v. Cartwright,* 486 U.S. at 356, 108 S.Ct. at 1859. The term "depravity of mind" may identify concerns distinct from those leading a legislative body to include torture of a victim as a circumstance warranting consideration of death as a sentence. However, if "depravity of mind" is to be an aggravating factor, it must be defined so that it aids the jury in determining under constitutional principles if the accused should be executed.

In accord with the principles of *Williams* and *Godfrey v. Georgia,* a proper limiting construction of "depravity of mind" to be given in those cases where torture is absent would be established by adopting the definition of that term set forth by the New Jersey Supreme Court in *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 230–231 (1987), where it held that this phrase marks

society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose). This term isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these random acts of violence. The killer who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that there was no reason to murder, evinces what we define as depravity of mind.

\* \* \* \* \* \*

What society is concerned with here … is the complete absence—from society's point of view—of any of the recognizable motivations or emotions that ordinarily explain murder.

In determining whether a murder is heinous, atrocious or cruel in that it involves depravity of mind, the jury also must base its findings on something more than the existence of one of the other statutory aggravating circumstances. Each part and every word of a statute is presumed to have meaning and purpose and should not be construed as superfluous or as surplusage. *Tidwell v. Collins*, 522 S.W.2d 674, 676–77 (Tenn.1975); *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). It must be assumed that in choosing those circumstances severe enough to warrant the death penalty the General Assembly did not intend to repeat itself in senseless duplication. For example, in this case, the showing that the defendant was an adult and the victim was a child under the age of twelve clearly established the aggravating circumstance contained in § 39–2–203(i)(1). As heinous and senseless as such a killing is, however, this factor should not be available to support circumstance (i)(5). The express inclusion of the killing of a child by an adult as a separate aggravating circumstance indicates that this circumstance alone is not meant to be included within aggravating circumstance (i)(5) since to do so would render circumstance (i)(5) superfluous. Such an interpretation of the statute not only clarifies the meaning of circumstance (i)(5) but also prevents the unintended "double-weighing" of aggravating factors encouraged by the vagueness of the previous statutory language.

An instruction embodying the *Ramseur* definition and this interpretation of circumstance (i)(5) would guide the jury in "distinguishing the few cases in which [the death penalty should be] imposed from the many cases in which it [should not be]," *Furman v. Georgia*, 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring), and would isolate those murders characterized by a vileness and inhumanity beyond that inherent in every first degree murder.

Analysis of the facts of this case under the *Ramseur* definition of depravity reveals an inconsistency in the logic of the jury's findings regarding aggravating circumstances. The murders encompassed by aggravating circumstance (i)(5) are those committed without "any of the recognizable motivations" ordinarily explaining murder. Yet the jury in this case found that the murder was committed with a purpose, although a "completely unjustified purpose," to prevent the defendant's apprehension for the murders of the victim's mother and sister. A killing cannot be committed for no recognizable purpose, and therefore demonstrating "depravity of mind," and at the same time for the purpose of preventing the perpetrator's identification and his "lawful arrest or prosecution."

I also conclude that the facts of this case are legally insufficient to establish the so-called "mass murder" aggravating factor found in T.C.A. § 39–2–203(i)(12). At first glance the evidence technically complies with the wording of the statute. However, review of the legislative history clearly reveals that this circumstance was intended to apply solely to serial murders like those committed in the late 1970s by Wayne Williams in Atlanta and the early 1980s by the "Son of Sam" in New York. *See State v. Bobo*, 727 S.W.2d 945, 951 (Tenn.1987). Even if the legislative intent had been to encompass murders like the multiple homicides inflicted by the sniper at the University of Texas, as the majority concludes, this murder still does not fall under the statute. The sum and substance of this killing was the domestic involvement between the defendant and the adult victim. The facts of this case do not show what is generally considered mass murder. In my view, in holding the evidence sufficient to support this circumstance, the Court is "not preserving the meaning and purpose of the legislative enactment, but [is] substantially altering its meaning and purpose as written and as clearly intended." *State v. Bobo*, 727 S.W.2d at 957 (Fones, J., dissenting).

## II.

The invalidation of these aggravating circumstances found by the jury requires examination of whether the error that has occurred is harmless. The majority upholds the applicability of § 39–2–203(i)(12) with the seemingly unsupported statement that any error in the jury's consideration of that circumstance "is harmless and could not have caused prejudice to the defendant." Perhaps, as it has done in the past, the Court is engaging in a quantitative analysis of aggravating and mitigating circumstances simply by counting the number of aggravating and mitigating factors. *See, e.g., State v. Hines,* 758 S.W.2d at 524; *State v. Bobo,* 727 S.W.2d at 955–956; *State v. Cone,* 665 S.W.2d 87, 95 (Tenn. 1984). Such analysis ignores the procedure by which a jury reaches its determination of whether death is an appropriate sentence. The process is not one of simply tallying aggravating and mitigating circumstances but of weighing their qualitative values. *See State v. Thompson,* 768 S.W.2d 239, 251–252 (Tenn.1989). As a result, one mitigating circumstance may outweigh six aggravating circumstances or vice versa. *See, e.g., State v. Barber,* 753 S.W.2d at 669; *State v. Harbison,* 704 S.W.2d 314, 320 (Tenn.1986).

Because under our sentencing scheme, the jury has this "discretion to weigh all the mitigating circumstances in terms of their value and significance, and to compare them to the quality of aggravating proof introduced," Feldman, *supra,* at 64, this Court must affirmatively pursue a review of the facts to determine what aspect of the defendant's conduct satisfies each aggravating circumstance. When the present case is analyzed in this manner, it is clear that the submission of invalid aggravating circumstances to the jury cannot be said to be harmless error. Once the remaining aggravating circumstances are distilled to their factual essence, it is evident that the defendant was found eligible for the death penalty because the victim was a child, T.C.A. § 39–2–203(i)(1); because the defendant had been involved in an earlier altercation with Angela Clay's husband, T.C.A. § 39–2–203(i)(2); and because he killed Lakeisha Clay in connection with the murder of her mother, T.C.A. § 39–2–203(i)(6) and (7). Qualitatively, except for the age of the victim, every aggravating circumstance properly found in this case arose from the defendant's emotional involvement with Angela Clay. On the other hand, in mitigation, the defendant presented testimony that before his involvement with Angela Clay, he had been a responsible and nonviolent person, that he was a model prisoner, that he suffered from psychological problems, and that his violent behavior was focused on the Clay family.

As this Court stated in *Delk v. State,* 590 S.W.2d 435, 442 (Tenn.1979), "the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required" to support the results reached by the jury. In this case the margin is slim. I would not find as a matter of law that the jury's consideration of these invalid aggravating circumstances was harmless error.

Furthermore, it is my opinion that the Court should not rely upon harmless error to affirm a sentence whenever one of the aggravating circumstances found by the jury is invalidated on appeal. No error with regard to this critical function can be harmless when a human being's life hangs in the balance. *See* Comment, *Deadly Mistakes: Harmless Error in Capital Sentencing,* 54 U.Chi.L.Rev. 740, 749–758 (1987). Harmless error analysis is particularly inappropriate in these circumstances under a capital sentencing scheme like Tennessee's in which each juror has the independent duty of weighing aggravating and mitigating circumstances and possesses the unfettered personal discretion to determine the existence of any mitigating factors. *See* T.C.A. § 39–13–204(f) and (g); *State v. Thompson,* 768 S.W.2d 239, 250–251 (Tenn. 1980). It is beyond the power of any court to say how error may have affected the performance of these inherently subjective duties. *Cf. State v. Pritchett,* 621 S.W.2d at 139 (Tenn.1981); *State v. Moore,* 614 S.W.2d 348, 352 (Tenn.1981). While I do

not deem it necessary that there must be some mitigating evidence in the proof to foreclose harmless error analysis, I do feel that such analysis is particularly inappropriate in a case like the present one where mitigating evidence was presented. I therefore would remand for resentencing.

### III.

I also conclude that remand is appropriate to dispose fully of another issue raised in this case. The sole method of implementing a sentence of death in this State is by electrocution. T.C.A. § 40–23–114. Prior to trial the defendant filed a "Motion to Exclude Death Penalty Because Electrocution Is Cruel and Unusual Punishment." No evidence was presented on the motion, and, finding "no support whatsoever for this position," the trial court denied the motion.

The majority dismisses the claim that the method of imposing the sentence of death is cruel and unusual punishment with reference to *State v. Adkins,* 725 S.W.2d 660, 664 (Tenn.1987), in which the Court stated, "This Court's authority over punishment for crime ends with the adjudication of constitutionality." The Court's observation obviously overlooks the substance of the constitutional prohibition against cruel and unusual punishment. This refusal to examine the issue of the constitutionality of the means of imposing death explains the trial court's finding that there is no case law supporting this position, but it does not dispose of the proposition that electrocution as a method of imposing the death penalty may be cruel and unusual punishment.

In addition to a brief account included with the defendant's pretrial motions, several court opinions, articles, and treatises contain graphic descriptions of the torture and lingering death suffered by the prisoner "after the switch is thrown." *See, e.g., Glass v. Louisiana,* 471 U.S. 1080, 1086–1092, 105 S.Ct. 2159, 2164–2168, 85 L.Ed.2d 514 (Brennan, J., dissenting); *State v. Dicks,* 615 S.W.2d at 137–138; *Hopkinson v. State,* 632 P.2d 79, 211–212 (Wyo.1981) (Rose, C.J., dissenting); *Tools for the Ulti-*

*mate Trial,* 2:10–2:11 (2d ed. 1987); Comment, *The Death Penalty Cases,* 56 Cal. L.Rev. 1268, 1338–1339 (1968); Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment,* 39 Ohio St. L.J. 96, 126 (1978). The literature, with its descriptions of repeated failures to achieve swift execution and of the multiple electric shocks endured by prisoners before death finally results, suggests that electrocution involves suffering beyond that necessary "in any method employed to extinguish life humanely." *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947). These accounts confirm Justice Brennan's statement that it is "difficult to imagine how such procedures constitute anything less than 'death by installments'—'a form of torture [that] would rival that of burning at the stake.'" *Glass v. Louisiana,* 471 U.S. at 1090–1091, 105 S.Ct. at 2166–2167 (Brennan, J., dissenting) (quoting *Louisiana ex rel. Francis v. Resweber,* 329 U.S. at 474, 476, 67 S.Ct. at 381, 382).

In *State v. Adkins,* this Court suggested that it was the sole prerogative of the legislature to address "the validity and humanity" of the complaint that electrocution should be replaced with more humane forms of execution. While legislative decisions concerning the appropriate forms of punishment are entitled to great deference, it is this Court's duty to interpret the constitution of this State and declare void any statute violating it. *See Brinkley v. State,* 125 Tenn. 371, 143 S.W. 1120, 1122 (1911). Legislative judgments alone cannot determine whether a punishment is cruel and unusual. *See Gregg v. Georgia,* 428 U.S. at 174 n. 19, 96 S.Ct. at 2925 n. 19 (opinion of Stewart, Powell, and Stevens, JJ.). Furthermore, it is widely accepted that clauses forbidding cruel and unusual punishment found in the early state and the federal constitutions were intended by their framers to apply to the cruelty of particular kinds of punishment, including the *method* of administering the death penalty. Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment,* 39

Ohio St.L.J. 96, 98 (1978); Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal.L.Rev. 839 (1969); *see also Furman v. Georgia*, 408 U.S. at 377, 92 S.Ct. at 2797–2798 (Burger, C.J. dissenting); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. at 464, 67 S.Ct. at 376.

The Court in *Adkins* apparently assumed the constitutionality of electrocution and considered the issue as one of choosing between constitutionally valid methods of imposing the death penalty. This Court and the federal courts have ruled in the past that electrocution as a means of carrying out a sentence of death violates neither the state nor the federal constitution. *See, e.g., In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Sullivan v. Dugger*, 721 F.2d 719 (11th Cir.1983); *Spinkellink v. Wainwright*, 578 F.2d 582, 616 (5th Cir.1978); *State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988); *State v. Adkins*, 725 S.W.2d at 664 (Tenn.1987), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987); *State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn.1984). Nonetheless, in none of these cases, except *In re Kemmler*, was any evidence presented concerning the facts of electrocution, including proof of any unnecessary and wanton pain inflicted on the prisoner.

This Court's previous holdings on this issue have been made without any but the briefest discussion of the arguments posed by defendants and seem in part to be but another reflection of the *Cozzolino* doctrine that requires no more under Article I, § 16 than has been mandated under the Eighth Amendment. Since the United States Supreme Court in 1890 stated in the case of *In re Kemmler*, 136 U.S. at 426, 10 S.Ct. at 930, that electrocution was a constitutionally permissible method of execution, this Court has concluded that a similar position is warranted under our constitution.

The circumstances under which *In re Kemmler*, the leading case in this area, was decided also weaken the continuing authority of the case law holding that electrocution is a constitutional method of inflicting the death penalty. Electrocution was first authorized in the United States as a means of killing criminals in 1888. In that year the New York legislature approved the dismantling of its gallows and the construction of an "electric chair" because it believed electrocution to be "the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases." *Glass v. Louisiana*, 471 U.S. at 1082, 105 S.Ct. at 2160 (Brennan, J., dissenting) (quoting Report of the Commission to Investigate and Report the Most Humane and Practical Method of Carrying Into Effect the Sentence of death in Capital Cases, at 3 (Transmitted to the Legislature of the State of New York, January 17, 1888)); H. Bedau, *The Death Penalty in America* 15 (3d ed. 1982). At that time it was thought that electrical science could "generate and apply to the person of the convict a current of electricity of such known and sufficient force as *certainly* to produce *instantaneous*, and therefore *painless*, death." *In re Kemmler*, 136 U.S. at 443, 10 S.Ct. at 932 (emphasis added).

It is apparent, then, that *Kemmler* was decided without any actual experience of electrocution as a means of execution. No prisoner had yet been subjected to this ordeal. In addition, the only federal constitutional issue before the court in that case was whether New York had acted arbitrarily or applied the law unequally to violate the Fourteenth Amendment. The Court in *Kemmler*, in fact, stated that the Eighth Amendment was inapplicable to the states. 136 U.S. at 446, 10 S.Ct. at 933. Its comments regarding the constitutionality of electrocution are therefore dictum. *See* Gardner, *supra*, 39 Ohio St.L.J. at 100–101.

The only other United States Supreme Court case of significance on this issue is *Louisiana ex rel. Francis v. Resweber*, 329 U.S. at 459, 67 S.Ct. at 374, in which the question was not whether electrocution per se violates the Eighth Amendment but whether an aborted initial execution renders subsequent attempts to execute the prisoner cruel and unusual. The plurality held that successive electrocutions were not unconstitutionally cruel, but even the

dissent assumed that electrocution involved instant and painless death. *Id.,* 329 U.S. at 474–475, 67 S.Ct. at 381–382.

In fact, the United States Supreme Court has never reviewed evidence of the actual pain inflicted by execution to determine whether this method of extinguishing a prisoner's life involves "unnecessary cruelty," *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345, 348 (1878), or something more than the mere extinguishment of life, *In re Kemmler,* 136 U.S. at 447, 10 S.Ct. at 933. The summary rejection of constitutional challenges to electrocution, usually based upon the dicta in *Kemmler,* has thus allowed our constitution to remain imprisoned by the scientific and medical knowledge and the standards of decency of the late nineteenth century. This refusal to consider the issue is completely contrary to the principle of "evolving standards of decency" at the heart of the Eighth Amendment and Article I, § 16. *See Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion).

It is time that this Court, the potential beneficiary of evidence of a century's experience in imposing electrocution, re-examine this issue. As Justice Brennan has written,

> But having concluded that the death penalty in the abstract is consistent with the "evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles,* 356 U.S., at 101, 78 S.Ct., at 598 (plurality opinion), courts cannot now avoid the Eighth Amendment's proscription of "the unnecessary and wanton infliction of pain" in carrying out that penalty simply by relying on 19th–century precedents that appear to have rested on inaccurate factual assumptions and that no longer embody the meaning of the Amendment. *Gregg v. Georgia, supra,* 428 U.S., at 173, 96 S.Ct., at 2925 (opinion of Stewart, POWELL, and STEVENS, J.J.).

*Glass v. Louisiana,* 471 U.S. at 1094, 105 S.Ct. at 2169 (mem., Brennan, J., dissenting from denial of certiorari).

I would hold that upon remand the defendant in this case should be allowed to present evidence to the court on the constitutional issue of whether electrocution per se is cruel and unusual punishment under Article I § 16, of the Tennessee Constitution.

## IV.

Based on the above reasons, I would reverse the sentence in the present case and remand the case to the trial court for further proceedings not inconsistent with this opinion.

I am authorized to say that Justice DAUGHTREY joins me in this dissent.