# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 12, 2005 Session

## STATE OF TENNESSEE v. KENNETH BUFORD, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 78521    Richard Baumgartner, Judge**

_____

**No. E2004-01780-CCA-R3-CD - Filed June 23, 2005**

_____

The defendant appeals his conviction for reckless endangerment, contending specifically that the evidence was insufficient to prove that he placed anyone in imminent danger of death or serious bodily injury. Upon review, we conclude that because the defendant fired the gun in the air, away from any person or potentially occupied building, the evidence is insufficient to sustain his conviction. Therefore, we reverse the conviction and dismiss the charges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Dismissed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Tony McGuire, Knoxville, Tennessee, for the appellant, Kenneth Buford, Alias.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; Ta Kisha Fitzgerald, Assistant District Attorney General; and Jennifer Beyland, Special Prosecuting Attorney, for the appellee, State of Tennessee.

## OPINION

Facts and Procedural History

The defendant, Kenneth Buford, was indicted by the Knox County Grand Jury on two counts of reckless endangerment with a deadly weapon (a Class E felony); two counts of possession of a firearm where alcoholic beverages are served (a Class A misdemeanor); and one count of unlawful possession of a weapon (a Class A misdemeanor). Following a jury trial, he was convicted of both counts of reckless endangerment with a deadly weapon and found not guilty of both counts of possession of a firearm where alcoholic beverages are served.[1] The two convictions were merged, and the defendant was sentenced to one year of probation. He now appeals to this court, contending

_____

[1] The record reflects that the trial court dismissed the remaining count of unlawful possession of a weapon.

that the evidence was insufficient to prove that his actions posed an imminent danger of death or serious bodily injury to others, as the statute requires.

At trial, Officer J.D. Hopkins testified that he was employed with the Knoxville Police Department and had occasion to respond to a disturbance at Club Temptations between 3:30 and 4:00 a.m. on February 1, 2003. Although initially dispatched to a fight call at the subject location, while *en route* he was additionally informed that gunshots had been fired. Hopkins stated that when he arrived, approximately fifty to seventy-five people were either standing in the parking lot adjacent to the club or attempting to leave. He further described the parking area as "[e]xtremely crowded." Shortly after he arrived, Hopkins spoke with Connie Tate about what had occurred, and Tate directed him to question the defendant.

Upon so doing, the defendant admitted that he had indeed fired the shots. Hopkins testified that the defendant explained that he was inside the establishment when someone informed him that a fight had broken out. In an attempt to break up the altercation, the defendant took a revolver from an unidentified man and proceeded outside. The defendant told Hopkins that he fired shots into the air to disperse the crowd and then went back into the club. Hopkins testified that the gun was confiscated by police following a consensual search of the building.

Hopkins explained that the club is between 250 and 300 feet from Austin Homes and that shots fired from Club Temptations could "absolutely" be heard from Austin Homes.[2] Additionally, Hopkins explained that the club's parking lot is between fifty and seventy-five feet from McCalla Avenue, a public thoroughfare. He stated that, in his experience, after a weapon is fired, people nearby become fearful and nervous. He further stated that gunshots increase the possibility that other armed individuals may draw a weapon in defense of themselves. In sum, he stated that such circumstances "make[] for an extremely unsafe situation." On cross-examination, Hopkins explained that he had responded to many calls to Club Temptations for "disorder type issues." He further acknowledged that gunshots are an effective way to disperse a crowd. Finally, Hopkins reiterated that the defendant stated that he fired the gun in the air.

Connie Tate then testified that, on the night of the incident, she was present at the club with her cousin and his girlfriend. She further stated that, shortly after paying to get into the club, her companions decided that they did not want to stay and asked for their money to be returned. Tate testified that, when their request was refused, the fight broke out and she phoned the police to report the disturbance. She further testified that, before the police arrived, the fight was broken up inside and that many of the patrons were leaving.

She stated that she first saw the defendant with the gun inside the club and that the defendant began shooting as she walked outside. Tate testified that there were "quite a few" people in the parking lot and further described the parking lot as "packed." She stated that when the defendant fired the shots, some people ducked and others ran to their cars. She testified that after the shots were fired, the defendant went back to the club and that the police arrived shortly thereafter. Finally, she

---

[2] Although not expressly stated, it appears from the record that Austin Homes is an apartment complex.

-2-

stated that she told the police what happened and then left. On cross-examination, Tate acknowledged that she did not see the defendant shoot the gun and did not know where the gun was pointed. However, she stated that she knew the defendant was the one who fired the shots because he was the only person in the parking lot who had a gun.

The State's final witness, Officer Aaron Bowman, testified that he was employed with the Knoxville Police Department and was one of the officers who responded to the subject incident. He recalled that the defendant stated that he was an employee of the club and gave consent to search the establishment. Bowman testified that he confiscated a .22 caliber revolver from behind the bar and that the revolver was fully loaded, with two spent rounds. He stated that the smell of gunpowder and the revolver itself indicated that the spent rounds were "freshly fired." Bowman testified that the defendant indicated that he "had control of the establishment" but did not state that he was in charge of security.

As the sole witness for the defense, Diana Howell testified that she was present on the night of the subject incident because she was working as a disc jockey in the club. She testified that the fight began in the hallway of the club, broke up shortly thereafter, and started again in the parking lot. She stated that she saw the defendant shoot the gun "up in the air, away from the crowd." Howell further testified that the defendant shot "away from McCalla [Avenue]" and "away from Austin Homes." She stated that the defendant fired the gun toward empty warehouses and that there were no people in that area. Howell testified that when the defendant fired the gun, it dispersed the crowd. When asked to describe the people involved in the altercation, Howell responded that two "big guys" were fighting and that there was a risk of injury.

On cross-examination, Howell admitted that she did not see where the defendant got the gun and that she was behind the defendant when the shots were fired. She further indicated that she was somewhat shocked that the defendant fired the gun but that the defendant did it "to scare the crowd off, [and] that's what it did." Finally, she admitted that she did not see where the shots landed.

Analysis

When an appellant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992); Tenn. R. App. P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences that may be drawn therefrom. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). This court will not reweigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Upon approval by the trial court, a jury verdict accredits the witnesses presented by the state and resolves all conflicts in favor of the state. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

The statute proscribing reckless endangerment is codified at Tennessee Code Annotated section 39-13-103 and states:

(a) A person commits an offense who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury.

(b) Reckless endangerment is a Class A misdemeanor; however, reckless endangerment committed with a deadly weapon is a Class E felony.

On appeal, the defendant's sole contention is that the evidence presented was insufficient to establish that the patrons standing in the parking lot were placed in imminent danger of death or serious bodily injury by the shots he fired in the air.

In support, he relies principally on State v. Fox, 947 S.W.2d 865 (Tenn. Crim. App. 1996), which involved a defendant who fired a gun "into the air or up into a tree." Id. In analyzing what the offense of reckless endangerment requires, a panel of this court opined:

[R]eckless endangerment is couched in terms of risk to another person produced by one's conduct. This court has previously recognized the potentially "absurd" and "unreasonable" results that may arise from permitting prosecution of one discharging "a weapon under any circumstances where any other human being might possibly be present or where a stray bullet might possibly strike another person." State v. Culbertson, 1995 Tenn. Crim. App. LEXIS 729, No. 03C01-9412-CR-00449, slip op. at 2 (Tenn. Crim. App. Aug. 30, 1995).

We find the appellant's mere discharge of a weapon into the air or up into a tree top did not "place another person in imminent danger of death or serious bodily injury." Merely discharging a gun, standing alone, is not sufficient to constitute [the] commission of reckless endangerment. See People v. Richardson, 97 A.D.2d 693, 468 N.Y.S.2d 114 (N.J. Super. Ct. App. Div. 1983) (holding discharge of gun into air does not constitute reckless endangerment).

Fox, 947 S.W.2d at 865-66. The defendant also cites State v. Payne, 7 S.W.3d 25 (Tenn. 1999), in which the highest court of this state noted that "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." Id. at 28.

We conclude that the above-cited cases are instructive in analyzing the case at hand. Although the state argues that the defendant's actions "posed a real and imminent threat" to those around him, we are of the opinion that any risk of death or serious bodily injury was a mere

possibility rather than a reasonable probability. Taken in a light most favorable to the state, the testimony reveals that the defendant fired two rounds, enough to disperse the crowd, took the revolver back inside the bar, and put it away. More importantly, the testimony established that the defendant fired the gun into the air, away from both the street and any buildings in the vicinity that could have been occupied. Therefore, the instant facts are analogous to Fox and are distinguishable from other cases in which we have sustained convictions for reckless endangerment. See State v. Alder, 71 S.W.3d 299 (Tenn. Crim. App. 2001) (reckless endangerment conviction sustained where the victim was in line of fire and individual next to the victim was shot); State v. Christopher Bengtson, No. E1999-01190-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 760 (Tenn. Crim. App., at Knoxville, Oct. 2, 2000) (conviction sustained where the defendant pointed loaded shotgun, with safety on, at a group of three people); State v. Steven Willard Self, No. 03C01-9807-CR-00227, 1999 Tenn. Crim. App. LEXIS 767 (Tenn. Crim. App., at Knoxville, July 30, 1999) (conviction sustained where the defendant shot and killed a dog when the owner was fifteen to twenty feet away from the animal). Upon review, we must conclude that the evidence did not establish that the defendant's actions created a reasonable probability of death or serious bodily injury. Therefore, the element of imminent danger was not satisfied.

## Conclusion

Because the proof established that the defendant pointed the gun in the air, away from any person or occupied building, we conclude that the evidence was insufficient to prove that any person was in imminent danger of death or serious bodily injury. As such, we reverse the defendant's conviction for reckless endangerment and dismiss the charges.

_____
JOHN EVERETT WILLIAMS, JUDGE