IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 7, 2005

## STATE OF TENNESSEE v. WILLIE WILSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-04273     W. Fred Axley, Judge**

---

**No. W2005-00680-CCA-R3-CD  - Filed February 16, 2006**

---

Following a jury trial, Defendant, Willie Wilson, was found guilty of two counts of aggravated robbery.  He received concurrent sentences of nine years for each conviction.  In his appeal, Defendant challenges the sufficiency of the evidence.  After a thorough review of the record, we conclude that the aggravated robbery convictions should be merged into a single conviction and the case remanded for entry of corrected judgments consistent with this opinion.  In all other respects, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed as Modified and Case Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert Wilson Jones, District Public Defender; Garland Ergüden, Assistant Public Defender; and Timothy Albers, Assistant Public Defender, Memphis, Tennessee, for the appellant, Willie Wilson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**

At trial, the State's first witness, the victim, Mark Branstetter, testified that at approximately 10:00 or 10:30 p.m. on December 8, 2001, he went to Patrick's Bar and Grill ("Patrick's") in the Audubon Square shopping center to meet a friend.  The crowded parking area was immediately adjacent to a walkway leading to Patrick's.  The walkway was roofed, with columns around the periphery and lights mounted in the ceiling every six feet.

The victim exited his car and proceeded down the walkway toward Patrick's. After proceeding less than ten feet, the victim saw two black males approach him from less than five feet away. The victim was able to see the men clearly. One of the men was short, stocky, and clean shaven, with a round face and dark clothing. The other man was thin and taller, wearing a Green Bay Packers Starter jacket. The assailants approached the victim; the shorter man came straight toward the victim while the taller man moved to the victim's right side. The shorter assailant placed a pistol to the victim's nose, and the taller assailant placed a small revolver behind the victim's right ear.

The assailants dragged the victim between two vehicles in the parking lot. One of the men told the victim, "come down or I'll shoot." They forced the victim face down on the pavement. Both of the men searched the victim's pockets. One of the assailants took the victim's wallet from the back pocket of his pants. The wallet contained the victim's driver's license, a gun permit, credit cards, and an automatic teller machine ("ATM") card. The assailants asked the victim for the PIN number for the ATM card. The victim did not respond. One or both of the assailants "[p]istol whipped" the back of the victim's head. After a few blows, the victim told the assailants a false pin number. The assailants struck the back of the victim's head once more. The victim fell to the ground, limp. Fearing for his life, he tried to pretend he was unconscious so the assailants would leave him alone.

The assailants, taking the victim's wallet and its contents, got into an "[o]ff-white, mid-size car" which was located immediately to the east of the victim. The victim saw lights, indicating that a truck was pulling into the parking lot. The assailants' car slowly backed out of the parking space and proceeded out of the parking lot. The victim raised his head in an attempt to see the licence plate of the assailants' car. He could only see half of the numbers on the tag. He did not notice any one but the assailants in the car as it left. The truck that had just arrived pulled up near the victim, and the driver asked the victim if he had been robbed. The victim replied that he had been. The victim asked the man driving the truck to follow the assailants far enough to see the licence plate number of their vehicle. The truck left the parking lot in the same direction as the assailants' car.

The victim, whose head was bleeding, walked into Patrick's. Someone gave him a towel for his bloody head. The victim called police to report the robbery, and police later arrived to take his statement. Thereafter, on January 6, 2002, police showed the victim a photographic array of suspects. The victim identified the two assailants from the array, although the names of the identified men were not disclosed at trial. The victim also made an in-court identification of Defendant as one of his assailants. He maintained that he was positive that his identification of Defendant was correct.

Jon Martin testified that at approximately 10:00 p.m. on December 8, 2001, he drove his Ford F-150 truck into Patrick's parking lot. He noticed that the parking lot was nearly full. A car blocked Mr. Martin's path through the parking lot. He saw a tall, thin, young black man get into the car before the car pulled out of the parking lot. Mr. Martin began to park when the victim stood. The victim's head was bleeding. The victim told Mr. Martin that he had been robbed, and he asked Mr. Martin to follow the assailants.

Mr. Martin drove in the direction taken by the assailants' car. He pulled behind the car while it was stopped at a red light and observed two people in the front seat of the car. While they were stopped, Mr. Martin wrote down the license plate number of the vehicle. Mr. Martin continued to follow the car for a few minutes. At the next red light, Mr. Martin saw one or two other individuals "peek" at him from the back seat of the car. Then, someone turned off the lights of the assailants' car. Soon thereafter, Mr. Martin lost track of the car.

Mr. Martin returned to Patrick's. By that time, police had arrived. Mr. Martin gave police the license plate number for the assailants' car.

Kelvin Johnson testified that on December 8, 2001, he was at the house of a relative named Pamela Ayers or Pamela Turner. The house was located in the Sherwood area. Defendant, Mario Turner, and a man named Krishon were also at the house. Mr. Johnson explained that he was related to Defendant and Mr. Turner by marriage. At some point in the evening, Mr. Turner asked Mr. Johnson to drive him to see a girl who lived in Cordova. Mr. Johnson agreed. Defendant and Krishon accompanied them. None of the men had been drinking, but they had been smoking marijuana.

The four men went to Cordova in Mr. Johnson's white 1989 Pontiac Lemans. Mr. Turner could not recall the exact address of the girl he wanted to see. They drove around trying to find her house, but they were unable to do so. Finally, Mr. Johnson announced that he was going to return to the house from which they had left. Mr. Turner asked him to stop first at "Spottswood and Perkins." Mr. Johnson agreed.

When Mr. Johnson arrived at the destination, he parked the car in the parking lot. Mr. Johnson remained seated in the driver's seat, and Krishon stayed in the back seat. Mr. Turner explained that he wanted to go into the building. He then got out of the car, followed by Defendant. Shortly after exiting the car, they grabbed the first person they saw, a white male. Defendant threw the victim against Mr. Johnson's car. Mr. Johnson was "shocked." He saw Defendant and Mr. Turner assaulting the victim. Mr. Johnson overcame his shock and started the car. Defendant jumped into the front passenger seat. Mr. Turner took off running toward the exit to the parking lot. Mr. Johnson drove toward the exit, and Mr. Turner got into the back seat of the car.

Mr. Johnson noticed that his car was being followed by a white truck. At some point, the truck stopped following him. Mr. Johnson drove the occupants of the vehicle home, then he returned to the home in Sherwood. When he arrived, he called police to report that his vehicle had been stolen. He explained that he lied about his car being stolen because he was afraid that he would be in trouble for the actions of Defendant and Mr. Turner. One month later, police came to see Mr. Johnson, and he told them what had really happened.

Mr. Johnson stated that he did not see Defendant or Mr. Turner with a gun on the night of the robbery. However, Mr. Johnson was aware that both men had permits to carry weapons and typically did so. Mr. Johnson said that Mr. Turner was taller than Defendant.

Defendant's mother, Shirley Wilson, testified as the sole defense witness. She stated that on the morning of December 8, 2001, a Saturday, Defendant called her and stated that he wanted to celebrate his birthday with her, as he did every year. Defendant's birthday was on Thursday, December 6. At 10:00 or 10:30 a.m., Mrs. Wilson drove to the house Defendant shared with his girlfriend and then brought him back to her house. After they arrived, Defendant drank a couple of beers and watched television. Soon thereafter, Defendant wanted to see James, one of his relatives. Mrs. Wilson drove Defendant to her sister's home to find James, but he was not home. They returned to Mrs. Wilson's house at approximately noon.

Mrs. Wilson cleaned house for a while, then she and Defendant went to get fish and beer. At 3:30 or 4:00 p.m., Mrs. Wilson cooked the fish. She noticed that by that time, Defendant was very drunk. Mrs. Wilson's cousin, Mary, arrived, and the three of them ate fish and drank beer. Mary left at 7:00 p.m. Defendant sat in the den and was asleep on the couch by 9:00 p.m. Mrs. Wilson checked on Defendant again before she went to bed at 11:00 p.m. He was still asleep on the couch. Mrs. Wilson opined that Defendant could not have left her house that night without her knowledge. She explained that she told police that Defendant had been with her during the time he allegedly robbed the victim.

Based upon the foregoing, the jury convicted Defendant of two counts of aggravated robbery. The trial court sentenced Defendant to an agreed sentence of nine years on each count, to be served concurrently. On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions.

## II. Sufficiency of the Evidence

In challenging the sufficiency of the evidence, Defendant specifically argues that the victim was mistaken in his identification of Defendant as one of the perpetrators. Defendant also requests that this court "merge his dual convictions and correct his record to show only a single conviction for aggravated robbery." When an accused challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). This court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The accused then has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

In determining the sufficiency of the evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (Tenn. 1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *Grace*, 493 S.W.2d at 476.

Defendant was convicted of two counts of aggravated robbery, which offense is defined as robbery "[a]ccomplished with a deadly weapon." T.C.A. § 39-13-402(a)(1) (1997). The offense of robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (1997). In the instant case, the victim testified that he was approached by two assailants. He could see the men clearly, and he positively identified Defendant as one of the assailants. The victim stated that the assailants pointed guns at his head, dragged him between two vehicles, and pushed him to the ground. They ordered him to comply or be shot. The assailants searched the victim and discovered his wallet. After finding his credit cards and ATM card in the wallet, the assailants demanded that the victim disclose the PIN number for the ATM card. The victim did not respond, and the assailants "[p]istol whipped" him. Then, the victim told them a false PIN number. The victim feared for his life. Upon seeing the lights of an approaching vehicle, the assailants left. Mr. Johnson corroborated the victim's identification of Defendant as one of the assailants. The jury, as was its prerogative, chose to believe the victim's identification of Defendant as one of the assailants. Therefore, we conclude that the foregoing proof is more than sufficient to uphold the appellant's convictions of aggravated robbery.

As we noted earlier, Defendant requested that this court merge his dual convictions of aggravated robbery into a single conviction. Our review of the record, reflects that count one of the indictment alleges that Defendant

> on December 8, 2001 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully, knowingly, and violently, by use of a deadly weapon, to wit: a handgun, obtain from the person of MARK BRANSTETTER, a driver's license, a credit card and a gun permit, under the value of Five Hundred Dollars . . . In violation of T.C.A. 39-13-402, against the peace and dignity of the State of Tennessee.

Count two alleges that Defendant

on December 8, 2001 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, by use of a deadly weapon, to wit: a handgun, put MARK BRANSTETTER, in fear and obtain from the person of MARK BRANSTETTER, a driver's license, a credit card and a gun permit, under the value of Five Hundred Dollars . . . In violation of T.C.A. 39-13-402, against the peace and dignity of the State of Tennessee.

Both counts one and two allege the same offense: the aggravated robbery of the victim. There is insufficient evidence to sustain two separate convictions of aggravated robbery. Accordingly, we conclude that Defendant's convictions should be merged into one conviction of aggravated robbery.

## CONCLUSION

Defendant's two convictions of aggravated robbery are merged into a single conviction of aggravated robbery. The judgment of the trial court is otherwise affirmed, and this case is remanded for correction of the judgments consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE